**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **JILL BEZEK**<br>1749 Forrest Avenue<br>Baltimore, MD 21234<br><br>and<br><br>**MICHELLE HARRIS**<br>249 Foster Knoll Drive<br>Joppa, MD 21085<br><br>Plaintiffs,<br><br>v.<br><br>**FIRST MARINER BANK**<br><u>Serve on:</u> Joseph Howard, Resident Agent<br>3301 Boston Street<br>Baltimore, MD 21224<br><br>Defendant. | Civil Action No.: |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Jill Bezek and Michelle Harris, on behalf of themselves and on behalf of the entire class of persons similarly situated, by and through their attorneys, Michael Paul Smith, Melissa L. English and Sarah A. Zadrozny of Smith, Gildea & Schmidt, LLC and Timothy F. Maloney, Veronica B. Nannis and Megan Benevento of Joseph, Greenwald and Laake, P.A., file this Class Action Complaint, sue the defendant for cause, claim damages, and state as follows:

## INTRODUCTION

1.  Plaintiffs are borrowers who currently have or had a federally related mortgage loan, as defined by 12 U.S.C. § 2602, originated and/or brokered by Defendant First Mariner Bank ("First Mariner"), which was or is secured by Plaintiffs' residential real property.

1

First Mariner referred Plaintiffs to Genuine Title, LLC for title insurance and settlement services.  Based on First Mariner's referral and recommendation, Plaintiffs purchased title insurance from Genuine Title and used Genuine Title for escrow and settlement services.

2.      Plaintiffs and Class Members were victims of an illegal kickback scheme between First Mariner and Genuine Title. Under the scheme, First Mariner's branch managers, loan officers, agents and/or other employees received unearned fees and kickbacks paid by Genuine Title, LLC, in violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.* ("RESPA").  These kickbacks were paid under a quid pro quo agreement for kickbacks in exchange for the referrals of borrowers by First Mariner to Genuine Title.  Neither First Mariner nor any of its employees and/or agents receiving the kickbacks performed any title or settlement services associated with the kickbacks.

3.      These kickbacks were fraudulently concealed by First Mariner and Genuine Title from Plaintiffs and Class Members and were omitted from Plaintiffs' and Class Members' HUD-1s and other required loan documents in an effort to hide the kickbacks from Plaintiffs and Class Members.

**PARTIES**

4.      Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 as a class action on their own behalf and on behalf of the entire class of people similarly situated.

5.      Plaintiff Jill Bezek is a resident of Baltimore County, Maryland.

6.      Plaintiff Michelle Harris is a resident of Harford County, Maryland.

7.      Defendant First Mariner Bank is a Maryland corporation and independently owned bank. During the relevant time frame, First Mariner Bank was engaged in the business of

consumer mortgage brokering and/or lending and/or otherwise transacted business in Maryland and elsewhere.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9.    This Court has personal jurisdiction over the parties.  Personal jurisdiction over First Mariner is appropriate because the principal place of business for First Mariner is in Maryland and at all relevant times First Mariner transacted business in Maryland and currently transacts business in Maryland.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the conduct, events and omissions giving rise to the claims occurred within this District and First Mariner systematically and continually transacted business in this District during the applicable time period.

## FACTUAL ALLEGATIONS FOR INDIVIDUAL AND CLASS RELIEF

11.    Congress enacted RESPA in 1974 as a response to certain abusive practices in the real estate settlement process. Congress found that kickbacks and unearned fees in the settlement process harmed residential mortgage borrowers by impeding fair competition among title and settlement service providers and depriving consumers of impartial advice and information regarding title and settlement services and  providers.  Congress recognized that these abusive practices also harmed consumers because the amounts charged to consumers for title and settlement services were higher than they would have been without the abusive practices and with fair and impartial competition.

12.    12 U.S.C. § 2607 states in relevant part:

(a) Business Referrals. No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any

agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) Splitting charges. No person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving federally related mortgage loan other than for services actually performed.

13. 12 U.S.C. § 2607(d)(2) states in relevant part:

Any person or persons who violate the prohibitions or limitations of [12 USC § 2607] shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

14. The purpose of 12 U.S.C. § 2607 is to eliminate payment of unearned fees in connection with settlement services provided in federally related mortgage transactions, and to protect consumers from the harms caused by coordinated business relationships for title and settlement services, including unnecessarily high title and settlement service charges. *See* 12 U.S.C. § 2601.

15. Genuine Title was at all relevant times a title services company licensed in various states, including Maryland, and regulated by the Maryland Insurance Commissioner.

16. At all relevant times, First Mariner's employees and/or agents were licensed mortgage brokers and/or authorized loan officers (collectively referred to herein as "Referring Brokers"), and at all relevant times were acting within scope of the business relationship and duties of their employment on behalf of First Mariner, specifically seeking borrowers ("First Mariner Borrowers") and securing loans for residential mortgages through First Mariner and/or brokering such loans through First Mariner to other lenders with whom First Mariner authorized, referring First Mariner Borrowers to title companies, and

working with title companies to close these loans. All activities, including the Referring Brokers' interaction with Genuine Title, were for the benefit of First Mariner.

**The Kickback Scheme**

17.    Beginning in 2009, and continuing until or about early 2014, Genuine Title perpetrated the Kickback Scheme by adopting a business model and practice of paying kickbacks to mortgage lenders and brokers, including First Mariner, for the referral of mortgage loans for title and settlement services.

18.    Genuine Title paid kickbacks in three forms: 1) "Referring Cash," 2) "Free Marketing Materials" (including postage, leads and other data and information, and direct mail production), 3) "Marketing Credits," and 4) "Turn Down Credits."

  **Referring Cash**

19.    Genuine Title paid Referring Cash directly to lenders' employees and/or agents in exchange for referrals of loans for settlement services.

20.    The Referring Cash was paid by Genuine Title, Competitive Advantage Media Group, LLC ("CAM"), a company formed by Brandon Glickstein, Genuine Title's lead marketing and account representative, and/or Brandon Glickstein, Inc. ("BGI"), another company formed by Brandon Glickstein. Specifically, CAM was created "to provide marketing services to businesses." *See* CAM SDAT Records, attached hereto as **Exhibit 1**. The Resident Agent for CAM at the time of organization was Jonathan S. Bach, Esq., the in-house attorney for Genuine Title. Additionally, the address for CAM was the same physical address of Genuine Title. On or about May 13, 2013, CAM changed its Resident Agent and Resident Agent's address to Michael N. Mercurio at 8171 Maple Lawn Boulevard, Suite 200, Fulton, Maryland 20759. *See* **Exhibit 1**. Brandon

Glickstein, Inc. was created for the purpose of "advertising and marketing and to engage in any other lawful purpose and business." *See* BGI SDAT Records, attached hereto as **Exhibit 2**.

21.     CAM and BGI were formed in part to facilitate Genuine Title's payment of kickbacks and unearned fees in exchange for referring borrowers to Genuine Title.

22.     The Referring Cash kickbacks varied in amount and correlated to the volume of referrals to Genuine Title by the lenders' branch managers, loan officers, employees and/or agents.

23.     Genuine Title calculated and paid Referring Cash kickbacks monthly and the kickbacks paid in a given month were equal to a per unit payment for each referred loan closed by Genuine Title in the previous month.

24.     In order to disguise and conceal receipt of Referring Cash payments, some Referring Brokers created shell companies to receive the Referring Cash payments. The shell companies had no business purpose except to serve as a conduit for the Referring Cash Payments. Other Referring Brokers used existing companies that they may have had to receive the Referring Cash Payments.  In either situation, the Referring Cash payments were solely for the purpose of the referral agreement and in furtherance of the Kickback Scheme.

25.     Referring Cash payments were made and received in this way to conceal, and did conceal, the Kickback Scheme from borrowers, including Plaintiffs and Class Members, and regulators.

26.     Referring Cash kickbacks were paid and received solely pursuant to the referral agreement and in furtherance of the Kickback Scheme and were not related to any legitimate services rendered by either Genuine Title or the person receiving the kickback.

### Free Marketing Materials

27.   Genuine Title also paid kickbacks in the form of Free Marketing Materials.

28.   As part of and in furtherance of the Kickback Scheme, Genuine Title, either directly and/or through CAM, paid for marketing materials that were provided to mortgage branch managers, brokers, loan officers and/or other employees at lenders.

29.   These Free Marketing Materials included but were not limited to: the culling and selecting of the highest value leads to send mail that would most closely match the mortgage products and programs that the lender would be featuring, payment for sales leads, payment for inserting and folding of mail pieces and/or postage. *See* B. Glickstein 9/15/16 Deposition at 16:7-18:18, attached hereto as **Exhibit 3**.

30.   Genuine Title provided Free Marketing Materials under the referral agreement whereby the receiving branch manager, broker, loan officer and/or other employee agreed to refer all loans generated by the Free Marketing Materials to Genuine Title for settlement services. *See* J. Zukerberg 4/24/2014 Deposition at 90:21-91:11, attached hereto as **Exhibit 4**.

31.   Free Marketing Materials were provided and received to conceal, and did conceal, the Kickback Scheme from borrowers, including Plaintiffs and Class Members, and regulators.

32.   The Free Marketing Materials kickbacks were paid and received solely pursuant to the referral agreement and in furtherance of the Kickback Scheme and were not related to any services rendered by either Genuine Title or the person receiving the kickback.

**Marketing Credits**

33.    Genuine Title also paid kickbacks in the form of Marketing Credits applied to invoices for marketing services lenders purchased from CAM.  While in operation, CAM provided marketing services to primarily smaller and/or regional lenders. These marketing services included designing, writing and printing marketing letters and other solicitation materials sent out on behalf of the lender, culling and selecting the highest value leads to send mail that would most closely match the mortgage products and programs that the lender would be featuring, and procurement of sales leads.

34.    As part of and in furtherance of the kickback scheme, Genuine Title entered into a referral agreement whereby a lender, branch or the loan officer (collectively, "Lender") would agree to refer loans to Genuine Title for settlement services and in return Genuine Title agreed to pay for marketing credits to be applied against that Lender's bill for services purchased from CAM.

35.    The Marketing Credit kickbacks were calculated monthly and the Marketing Credit in a given month was determined on a per unit amount or basis for each referred loan closed by Genuine Title in the previous period.

36.    Genuine Title paid CAM the amount of the Marketing Credit and, in turn, CAM applied the Marketing Credit against the Lender's bill for CAM services.

37.    Marketing Credits and the multi-party marketing credit system was used by all parties to conceal, and did so conceal, the Kickback Scheme from borrowers, including Plaintiffs and Class Members, and regulators.

**Turn Down Credits**

38. During the time period of, and as a result of, the Kickback Scheme, Genuine Title had a large stable of various lenders who were referring borrowers to Genuine Title to perform closings and settlement services. ("Referring Lenders").

39. Genuine Title recognized that all of the various Referring Lenders had different lending criteria, meaning one Referring Lender may not be able to make a loan to a particular borrower, but that the same borrower might qualify for a refinance at a different Referring Lender ("Turn Down Opportunity").

40. Referring Lenders had at least type of Turn Down Opportunity whereby borrowers who had loans originated or serviced by one Referring Lender could get approved for a refinancing of their loan from that same Referring Lender, even if their credit score or the amount of the loan as compared to the appraised value (commonly known as Loan to Value or LTV) did not meet the criteria required by other Referring Lenders.

41. Genuine Title established referral agreements and kickbacks specifically related to Turn Down Opportunities whereby Genuine Title recruited Referring Lenders to send Turn Down Opportunities to other Referring Lenders in exchange for, and with the understanding that, Genuine Title receive the title work. The Referring Lenders who sent the Turn Down Opportunity ("Sending Lender") would receive either Referring Cash, Marketing Credits, and/or a combination thereof for every loan that was referred to, and closed with, Genuine Title.

42. In addition, the Referring Lender who received the Turn Down Opportunity ("Receiving Lender") received Kickbacks in the form of Turn Down Opportunities as well as

Referring Cash, Marketing Credits, and/or a combination thereof for every loan that was referred to, and closed with, Genuine Title.

43.     Under this Turn Down Opportunity portion of the Kickback Scheme, the Receiving Lender obtained refinances that they would not otherwise have received during that timeframe as well as Referring Cash, Marketing Credit, and/or a combination thereof. The Sending Lender received Referring Cash, Marketing Credits, or a combination thereof when it would otherwise have received nothing because they could not do the loan.  Genuine Title received a referral of another borrower to close their loan from the combined effort of the Receiving Lender and the Sending Lender (collectively known as "Turn Down Credits").

44.     Neither the Receiving Lender nor the Sending Lender nor any of it agents, servants or employees performed any Settlement Services in connection with their receipt of the kickbacks or credits outlined herein.

45.     The Referring Cash, Free Marketing Materials, Marketing Credits, and Turn Down Credits were provided as a quid pro quo, and pursuant to and with an understanding and agreement that the lenders' branch managers, loan officers, agents, and/or employees receiving the Referring Cash, Free Marketing Materials, Marketing Credits, and Turn Down Credits would refer borrowers to Genuine Title for real estate title and settlement services, including performing a title search and procuring title insurance.

46.     When regulators began to investigate Genuine Title around October 2013, Genuine Title drafted and back-dated sham Title Services Agreements for some Referring Brokers with the intent to disguise and conceal the Referring Cash kickbacks as legitimate fees for alleged services provided by Referring Brokers. However, the kickbacks were not

provided in accordance with the fee schedule in the Title Services Agreements and the branch managers, loan officers, agents, and/or employees performed no services for Genuine Title. *See* sham Title Service Agreement with former First Mariner branch manager Angela Pobletts, attached hereto as **Exhibit 5**.

47.    Upon information and belief, the sham Title Services Agreements were used to conceal, and did so conceal, the Kickback Scheme from borrowers, including Plaintiffs and Class Members, and regulators.

48.    The receipt of Referring Cash, Free Marketing Materials, and/or Marketing Credits were omitted from borrowers' HUD-1s to conceal, and did in fact conceal, the Kickback Scheme from borrowers, including Plaintiffs and Class Members, and regulators.

49.    While Genuine Title would have preferred to compete by providing lower pricing of its title and settlement services to borrowers instead of paying kickbacks, the payment of kickbacks was the more effective way to increase Genuine Title's market share in the title and settlement services market, even though it was prohibited by law. *See* J. Zukerberg 5/20/16 Aff. ¶ 6, attached hereto as **Exhibit 6**.

50.    Genuine Title has admitted that no title services were provided by any lender receiving kickbacks, in whatever form those kickbacks were paid. *See id.*

51.    Genuine Title has admitted that borrowers, including Plaintiffs and Class Members, paid the cost of the concealed kickbacks out of the title and settlement costs charged and identified on their HUD-1s. *See id.*

**First Mariner's Participation in the Kickback Scheme**

52.    First Mariner and its managers and employees participated in the Kickback Scheme. Genuine Title's records indicate that from 2009 through 2014, First Mariner referred more than 250 loans to Genuine Title for settlement services.

53.     Beginning in 2009, and upon information and belief, continuing until on or about early 2014 based upon Genuine Title and First Mariner's agreement and continuing pattern of practice, licensed mortgage brokers employed by First Mariner received kickbacks in the form of Referring Cash, Free Marketing Materials, Marketing Credits, and other things of value from Genuine Title, CAM, and/or BGI in exchange for referrals of First Mariner Borrowers to Genuine Title for settlement services ("Referring Agreement"), in violation of RESPA. During the relevant time period, Angela Pobletts, Tony Sergi, Brad Restivo, Walter Alton, and Tom Bowen were employed by First Mariner as branch managers and/or loan officers.

54.     From September 2012 to February 2014, Angela Pobletts was a branch manager employed by First Mariner at its White Marsh branch.  At all times while Pobletts was employed with First Mariner, and within the course and scope of that employment, Genuine Title paid, and Pobletts received and accepted, kickbacks via her sham company MARC, LLC, totaling at least $34,000.00 in Referring Cash in exchange for referrals of borrowers from the First Mariner branch managed by Pobletts.  *See* checks to MARC, LLC, attached hereto as **Exhibit 7**.

55.     From December 2008 to December 2014, Tony Sergi was a branch manager employed by First Mariner at its White Marsh branch.  At all times while Sergi was employed with First Mariner, and within the course and scope of that employment, Genuine Title via CAM paid, and Sergi received and accepted, kickbacks totaling at least $8,000 in Referring Cash in exchange for referrals of borrowers from the First Mariner branch managed by Sergi.  *See* checks to Tony Sergi, attached hereto as **Exhibit 8**.

56.    Based upon Genuine Title and First Mariner's continuing pattern of practice, Plaintiffs believe and therefore aver that, in addition to Pobletts and Sergi, other currently known or unknown Referring Brokers, loan officers, and other employees and/or agents employed by First Mariner participated in the Kickback Scheme, including but not limited to Brad Restivo, Walter Alton, and Tom Bowen.

57.    Based upon Genuine Title and First Mariner's continuing pattern of practice, Plaintiffs believe and therefore aver that Genuine Title provided, and currently known and unknown Referring Brokers employed by First Mariner received and accepted, other things of value in exchange for referring borrowers to Genuine Title.

58.    No title services were provided by First Mariner and/or its Referring Brokers, agents, and/or employees associated with the receipt of the kickbacks.  *See* **Exhibit 6**, ¶ 6.

59.    The payment by Genuine Title and acceptance by First Mariner of the kickbacks were solely for the referral of borrowers to Genuine Title.

60.    Plaintiffs were charged for settlement services related to their federally-related mortgage by Genuine Title while First Mariner was engaging in the Kickback Scheme.

61.    As a result of the Kickback Scheme, Plaintiffs and class members were deprived of kickback-free settlement services and impartial and fair competition, as required by 12 U.S.C. § 2607, and as a result paid higher settlement charges, among other harms.

62.    Plaintiffs and class members paid more for their settlement services because First Mariner's Referring Brokers performed no services in exchange for the kickbacks paid and kickbacks were paid instead of lower charges to the consumers.

## FACTS FOR INDIVIDUAL CLASS REPRESENTATIVES

63.     In or about December 2010, Plaintiff Jill Bezek obtained a residential mortgage from First Mariner through Referring Broker Tony Sergi in relation to the refinancing of her residential real property in Baltimore County, Maryland.

64.     First Mariner Referring Broker Sergi referred Plaintiff Bezek to Genuine Title for title and settlement services. On the basis of this referral, Plaintiff Bezek used Genuine Title for title and settlement services and settled on December 13, 2010.  Plaintiff Bezek paid Genuine Title for title and settlement services.

65.     First Mariner Referring Broker Sergi referred Plaintiff Bezek to Genuine Title for title and settlement services pursuant to an agreement with Genuine Title for Referring Cash as quid pro quo for referrals to Genuine Title and did so receive Referring Cash from Genuine Title via CAM.

66.     Plaintiff Bezek paid Genuine Title for those title and settlement services.  A portion of that payment was illegally split and shared with First Mariner through the payment of an illegal kickback to Sergi.

67.     First Mariner and Genuine Title falsely represent on Plaintiff Bezek's HUD-1 that Genuine Title retained all amounts that it charged Plaintiff Bezek, and does not state that any portion of the amounts charged Plaintiff Bezek by Genuine Title were paid to First Mariner.

68.     First Mariner and Genuine Title falsely represent on Plaintiff Bezek's HUD-1 that First Mariner did not receive any compensation from Genuine Title related to Plaintiff Bezek's loan.

69. First Mariner and Genuine Title made these and other false representations on Plaintiff Bezek's HUD-1 and other required loan documents in an effort to conceal the kickbacks from Plaintiff Bezek, and did so conceal the kickbacks from Plaintiff Bezek.

70. As a pattern of practice, and as a precondition to closing a loan or refinance, First Mariner required borrowers to fully participate in the loan transaction, including receiving and signing government-required loan documents before and at a loan closing.

71. Plaintiff Bezek fully participated in her loan transaction as evidenced by her loan funding on or about December 17, 2010.

72. In or about October 2012, Plaintiff Michelle Harris obtained a residential mortgage from First Mariner through Referring Broker Tony Sergi in relation to the refinancing of her residential real property in Harford County, Maryland.

73. First Mariner Referring Broker Sergi referred Plaintiff Harris to Genuine Title for title and settlement services. On the basis of this referral, Plaintiff Harris used Genuine Title for title and settlement services and settled on October 19, 2012.  Plaintiff Harris paid Genuine Title for title and settlement services.

74. First Mariner Referring Broker Sergi referred Plaintiff Harris to Genuine Title for title and settlement services pursuant to an agreement with Genuine Title for Referring Cash as quid pro quo for referrals to Genuine Title and did so receive Referring Cash from Genuine Title via CAM.

75. Plaintiff Harris paid Genuine Title for those title and settlement services.  A portion of that payment was illegally split and shared with First Mariner through the payment of an illegal kickback to Sergi.

76.    First Mariner and Genuine Title falsely represent on Plaintiff Harris' HUD-1, and various HUD-1 Addendums, that Genuine Title retained all amounts that it charged Plaintiff Harris, and does not state that any portion of the amounts charged Plaintiff Harris by Genuine Title were paid to First Mariner.  *See* Harris HUD-1, attached hereto as **Exhibit 9**.

77.    First Mariner and Genuine Title falsely represent on Plaintiff Harris' HUD-1, and various HUD-1 Addendums, that First Mariner did not receive any compensation from Genuine Title related to Plaintiff Bezek's loan. *Id.*

78.    First Mariner and Genuine Title made these and other false representations on Plaintiff Harris' HUD-1 and other required loan documents in an effort to conceal the kickbacks from Plaintiff, and did so conceal the kickbacks from Plaintiff.

79.    As a pattern of practice, and as a precondition to closing a loan or refinance, First Mariner required borrowers to fully participate in the loan transaction, including receiving and signing government-required loan documents before and at a loan closing.

80.    Plaintiff Harris fully participated in her loan transaction as evidenced by their loan funding on or about October 24, 2012.

81.    Under federal law, First Mariner is required to provide each borrower with a Good Faith Estimate ("GFE") within three days of taking a loan application. On the GFE, the loan officer or broker "must state here all charges that all loan originators involved in this transaction will receive." 12 C.F.R. 1024, App'x C – Instructions for Completing Good Faith Estimate (GFE) Form.

82.    As a continuing pattern of practice, and in an effort to conceal its fraud, First Mariner did not report on Plaintiffs Bezek's or Harris's or on any borrower's GFE the kickback

received from Genuine Title under the Referring Agreement, despite the fact that the kickbacks were charged to and paid by the borrowers and received and accepted by First Mariner. *See* Harris GFE, attached hereto as **Exhibit 10**.

83.    As a result of this act of concealment, no borrower, including Plaintiffs Bezek and Harris, received a GFE associated with a loan originated or brokered by First Mariner reflecting a payment of any kind from Genuine Title to First Mariner. Therefore, borrowers, including Plaintiffs Bezek and Harris, did not know and could not have known of the kickback to First Mariner, or the Kickback Scheme, before the closing of their loan.

84.    RESPA requires that each borrower receive a HUD-1 Settlement Statement. 12 U.S.C. § 2603(a). The purpose of the HUD-1 statement is to, among other things, "conspicuously and clearly itemize all charges imposed upon the borrower. . . ." *Id.* Under regulations imposed by the federal government, "[t]he loan originator must transmit to the settlement agent all information necessary to complete the HUD-1 or HUD-1A." 12 C.F.R. § 1024.8(b). As such, First Mariner was responsible for all information included in the HUD-1 that was then generated by Genuine Title.

85.    As a continuing pattern of practice, and in an effort to conceal its fraud, First Mariner did not provide to Genuine Title for inclusion in the HUD-1 any information necessary to itemize the kickback payments made to First Mariner by Genuine Title under the Referring Agreement, despite the fact that the kickbacks were charged to and paid by the borrowers.

86.    Despite being required by law to report the amounts paid and received as a result of the transaction, First Mariner and Genuine Title falsely represented that Genuine Title retained all amounts charged borrowers for title and settlement services and that no

compensation was paid by Genuine Title to First Mariner related to the transaction. First Mariner and Genuine Title omitted the fact and amount of the kickbacks from all lines and sections of Plaintiffs' HUD-1 settlement statement and all other required loan documents in an effort to intentionally conceal the kickbacks from Plaintiffs, and did so conceal the kickbacks from Plaintiffs.

87.     As a pattern of practice and in an effort to conceal its fraud, Genuine Title purposefully did not produce a HUD-1 Settlement Statement that itemized the kickbacks paid to and received and accepted by First Mariner under the Referring Agreement, despite the fact that the kickbacks were charged to and paid by the borrowers. *See* **Exhibit 6**, at ¶ 6; **Exhibit 3**, 159:15-160:1.

88.     As a result of these acts of concealment, no borrower, including Plaintiffs Bezek and Harris, received a HUD-1 statement reflecting a payment of any kind from Genuine Title to First Mariner, and did not know and could not have known of the kickback, or the Kickback Scheme, at or after the closing of their loan. *See* **Exhibit 9**.

89.     Because no payment from Genuine Title to First Mariner was disclosed on their HUD-1, Plaintiffs Bezek and Harris did not have, and could not have had, any knowledge of the kickbacks during or after the settlement on their mortgage loan, or that a portion of their payment to Genuine Title for title and settlement services was illegally split and shared with First Mariner through the payment of the illegal kickbacks to Tony Sergi.

90.     As a direct and proximate cause of the actions of First Mariner, Plaintiffs Bezek and Harris and other Class Members were deprived of impartial and fair competition between settlement service providers in violation of RESPA, denied kickback-free settlement services, and paid more for said settlement services.

## CLASS ALLEGATIONS

91.    The allegations in the above stated paragraphs are incorporated by reference as if fully

restated herein.

92.    Plaintiffs bring this action on behalf of themselves and all other similarly situated

individuals pursuant to Fed. R. Civ. P. 23, and the alleged class is defined as follows:

> All individuals in the United States who were borrowers on a
> federally related mortgage loan (as defined under the Real Estate
> Settlement Procedures Act, 12 U.S.C. § 2602) originated or
> brokered by First Mariner Bank for which Genuine Title provided
> a settlement service, as identified in Section 1100 on the HUD-1,
> between January 1, 2009, and December 31, 2014. Exempted from
> this class is any person who, during the period of January 1, 2009
> through December 31, 2014, was an employee, officer, member
> and/or agent of First Mariner Bank, Genuine Title, LLC,
> Competitive Advantage Media Group, LLC, Brandon Glickstein,
> Inc., and/or Dog Days Marketing, LLC.

93.    There are questions of law and fact common to the claims of each and all members of the

Class. These common questions include, but are not limited to:

a.    Whether First Mariner and its employees and/or agents received unearned fees and

illegal kickbacks from Genuine Title and/or CAM for the referral of business to

Genuine Title;

b.    Whether payments to First Mariner and its employees and/or agents violated

RESPA;

c.    Whether Plaintiffs and Class Members were forced to pay more for said settlement

services;

d.    Whether First Mariner actively concealed the Kickback Scheme to avoid detection

by Plaintiffs and Class Members;

e.    Whether Plaintiffs and the Class are entitled to treble damages under RESPA;

f.    Whether Plaintiffs and the Class are entitled to attorneys' fees and expenses under RESPA;

g.    Whether Genuine Title failed to disclose and concealed to Plaintiffs and Class Members that Genuine Title and/or CAM was participating with banks, referring branch managers, loan officers, employees and/or agents and failed to disclose and concealed, among other things, their affiliated business arrangements and/or relationships; and

h.    Whether despite exercising reasonable due diligence, Plaintiffs and Class Members did not and could not have learned of the illegal kickbacks until contacted by counsel.

94.    These common issues of law and fact predominate over any question affecting only individual Class members.

95.    Due to Genuine Title and First Mariner's efforts to conceal the kickbacks from Plaintiffs, Class Members, regulators, and the public through the payment of kickbacks to sham LLCs, a multi-layered marketing credit system, and the execution of sham Title Services Agreements, which were extraordinary circumstances beyond Plaintiffs' control, Plaintiffs did not, and could not have discovered the Kickback Scheme before, at the time of, or after the settlement of their residential mortgage loan and within the statutory filing period. No reasonable borrower diligence or investigation would have uncovered the fact, mechanics and extent of this illegal kickback scheme until contacted by counsel.

96.    Due to Genuine Title and First Mariner's omission of kickbacks from any line and section on borrowers' GFEs, HUD-1s, and or other loan documents, Plaintiffs and Class

Members did not and could not have known of the kickbacks or the Kickback Scheme before, during, or after the settlement of their residential mortgage loans.

97.     Plaintiffs acted reasonably and diligently. Plaintiffs did not and could not through any reasonable diligence have known about the concealed Kickback Scheme until contacted by undersigned counsel on or about August 24, 2017.

98.     The Plaintiffs' transaction and the course of events thereafter exemplify the working of the Kickback Scheme, and are typical of the transactions involving all members of the proposed class.

99.     The Plaintiffs' claims are typical of the claims or defenses of the respective Class members, and are subject to the same statutory measure of damages set forth in 12 U.S.C. § 2607(d)(2).

100.   Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the named Plaintiffs and all other members of the Class are identical.

101.   Plaintiffs' counsel has substantial experience in complex litigation and class action proceedings, have been approved as class counsel in related litigation, and will adequately represent the Class's interests.

102.   The Class consists, upon information and belief, of hundreds of borrowers, and thus are so numerous that joinder of all members is impracticable.

103.   Separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for First Mariner.

104. This action entails questions of law and fact common to Class Members that predominate over any questions affecting only individual Plaintiffs, and, therefore, a class action is superior to other available methods of fair and efficient adjudication of this litigation.

105. Most members of the Class are unaware of their rights to prosecute a claim against Defendant.

106. No member of the Class has a substantial interest in individually controlling the prosecution of a separate action, but if he or she does, he or she may exclude himself or herself from the class upon the receipt of notice under Fed. R. Civ. P. 23(c).

<u>**COUNT I**</u>
<u>**Violation of the Real Estate Settlement Procedures Act (RESPA),**</u>
<u>**12 U.S.C. § 2607(a) and (b)**</u>

107. Plaintiffs incorporate the above stated paragraphs as if restated herein.

108. All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

109. At all relevant times, Genuine Title was subject to the provisions of RESPA, 12 U.S.C. § 2601, *et. seq.*

110. As a lender and/or broker and/or servicer of federally related mortgage loans, First Mariner is subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

111. Genuine Title and/or CAM paid First Mariner kickbacks and/or things of value in exchange for referrals of business to Genuine Title in violation of RESPA, 12. U.S.C. § 2607(a) and (b).

112. First Mariner by and through its brokers, loan officers, employees and/or agents received and accepted things of value for referrals of business as part of real estate settlement

services provided to Plaintiffs and Class Members, in violation of RESPA, 12 U.S.C. § 2607(a) and (b).

113.    All loans referred to Genuine Title as part of the Kickback Scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by First Mariner and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

114.    The payment and/or arranging of payment of kickbacks to First Mariner by Genuine Title and/or CAM and First Mariner's receipt thereof constitute a violation of § 8(a) of RESPA, which prohibits the payment of referral fees or kickbacks pursuant to an agreement in connection with the origination or brokering of federally related mortgage loans.

115.    The kickbacks paid by Genuine Title and/or CAM to First Mariner were also made solely for the purpose of Genuine Title receiving referrals and no services were actually performed by First Mariner in connection with the receipt of these payments and/or things of value, in violation of 12 U.S.C. § 2607(b), which prohibits the splitting of fees in connection with the origination of federal related mortgage loans.

116.    Genuine Title and First Mariner fraudulently and actively concealed the kickbacks paid to Referring Brokers from Plaintiffs and Class Members by refusing to list the kickbacks on Plaintiffs and Class Members' HUD-1 settlement statements and settlement documents, and failed and refused to disclose their affiliated business arrangement and by engaging in an elaborate payment scheme to conceal the illegal kickbacks.

117.   Despite acting reasonably and exercising due diligence, Plaintiffs and Class Members did not and could not have known about the Kickback Scheme until contacted by undersigned counsel.

118.   As a direct and proximate cause of Genuine Title's actions, Plaintiffs and Class Members used Genuine Title for title and settlement services, paid for said services and were deprived of impartial and fair competition and the costs paid by Plaintiffs and Class Members to Genuine Title for settlement services would have been lower.

WHEREFORE:

a.   Plaintiffs respectfully demand this Court to certify this class action pursuant to Federal Rule of Civil Procedure 23 and set this matter for trial; and

b.   Demand judgment for Plaintiffs and Class Members against First Mariner and award Plaintiffs and Class Members an amount equal to:

    1.   Treble damages for settlement services charged by Genuine Title, including, but not limited to, title insurance premiums, in an amount equal to three times the amount of any charge paid for such settlement services, pursuant to 12 U.S.C. § 2607(d)(2);

    2.   Reasonable attorneys' fees, interest and costs pursuant to 12 U.S.C. § 2607(d)(5); and

    3.   Such other and further relief as this Court deems proper.

Respectfully submitted,

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Timothy F. Maloney, Esq. #03381 | Michael Paul Smith, Esq. #23685 |
| Veronica B. Nannis, Esq. #15679 | Melissa L. English, Esq. #19864 |
| Megan A. Benevento, Esq. #19883 | Sarah A. Zadrozny, Esq. #13911 |
| Joseph, Greenwald & Laake, P.A. | Smith, Gildea & Schmidt, LLC |
| 6404 Ivy Lane, Suite 400 | 600 Washington Avenue, Suite 200 |
| Greenbelt, Maryland 20770 | Towson, Maryland 21204 |
| (301) 220-2200 / (301) 220-1214 (fax) | (410) 821-0070 / (410) 821-0071 (fax) |
| Email: tmaloney@jgllaw.com | Email: mpsmith@sgs-law.com |
| vnannis@jgllaw.com | menglish@sgs-law.com |
| mbenevento@jgllaw.com | szadrozny@sgs-law.com |
| *Co-Counsel for Plaintiffs and Class Members* | *Counsel for Plaintiffs and Class Members* |

## **PRAYER FOR JURY TRIAL**

Plaintiffs and Class Members hereby request a trial by jury on the foregoing Class Action

Complaint.

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Timothy F. Maloney, Esq. #03381 | Michael Paul Smith, Esq. #23685 |
| Veronica B. Nannis, Esq. #15679 | Melissa L. English, Esq. #19864 |
| Megan A. Benevento, Esq. #19883 | Sarah A. Zadrozny, Esq. #13911 |
| Joseph, Greenwald & Laake, P.A. | Smith, Gildea & Schmidt, LLC |
| 6404 Ivy Lane, Suite 400 | 600 Washington Avenue, Suite 200 |
| Greenbelt, Maryland 20770 | Towson, Maryland 21204 |
| (301) 220-2200 / (301) 220-1214 (fax) | (410) 821-0070 / (410) 821-0071 (fax) |
| Email: tmaloney@jgllaw.com | Email: mpsmith@sgs-law.com |
| vnannis@jgllaw.com | menglish@sgs-law.com |
| mbenevento@jgllaw.com | szadrozny@sgs-law.com |
| *Co-Counsel for Plaintiffs and Class Members* | *Counsel for Plaintiffs and Class Members* |