IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JILL BEZEK, *et al.*, | *- | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Case No. SAG-17-2902 |
| | * | |
| FIRST MARINER BANK, | * | |
| | * | |
| Defendant. | * | |
| | * | |

************

## MEMORANDUM OPINION

This matter concerns a Motion to Certify Class pursuant to Rule 23 of the Federal Rules of Civil Procedure ("the Motion"). ECF 34. Jill Bezek and Michelle Harris (collectively "Plaintiffs") seek to represent a class of borrowers who had a federally related loan serviced by Defendant, First Mariner Bank ("First Mariner"). ECF 1 ¶ 1. First Mariner opposed the Motion, ECF 39, and Plaintiffs filed a Reply, ECF 44. A telephonic hearing was held on September 10, 2020. For the reasons that follow, the Motion, ECF 34, will be GRANTED.

### I. FACTUAL BACKGROUND

First Mariner is a Maryland corporation and independently owned bank. ECF 1, ¶ 7. Genuine Title was a title service company operating in Maryland. Plaintiff alleges that, from 2009 through 2014, First Mariner brokers referred more than 250 loans (including Plaintiffs') to Genuine Title for settlement services, pursuant to an illegal kickback scheme. *Id.* ¶ 52. In general terms, Plaintiffs allege that Genuine Title would provide First Mariner loan officers with one of four forms of kickbacks, in exchange for referrals: (1) cash payments ("Referral Cash"), (2) free marketing materials ("Marketing Materials"), (3) credits for future marketing services ("Marketing Credits"), or (4) customer referrals from other lenders who turned down the borrower for not meeting their institution's required qualifications ("Turn Down Credits"). ECF 1, ¶¶ 19-43. Bezek

1

refinanced her mortgage with First Mariner through loan officer Tony Sergei, at First Mariner's White Marsh, Maryland branch, in December, 2010. ECF 1 at ¶ 63. Likewise, Harris refinanced her mortgage with Sergei in October, 2012. *Id.* at ¶ 72. As a result of this scheme, Plaintiffs claim they were deprived of kickback-free settlement services and impartial and fair competition, as the Real Estate Settlement Procedures Act ("RESPA") requires, 12 U.S.C. § 2607, and paid more for their settlement services than they otherwise would have. *Id.* ¶¶ 61-62. Brandon Glickstein, who worked for Genuine Title, explained that Sergei received around $200 per loan referred to Genuine Title. ECF 34-17 at ¶ 8(a).

Plaintiffs provide additional details about the alleged Genuine Title kickback scheme in their Complaint. They allege that Glickstein created multiple business entities that could facilitate Genuine Title's kickback arrangements. Glickstein formed Brandon Glickstein, Inc. ("BGI") and Competitive Advantage Media Group ("CAM") to facilitate kickback payments, and to offer free marketing materials to lenders, in exchange for referrals. *Id.* ¶¶ 20-21. Glickstein previously testified that ninety percent of loans serviced by Genuine Title from 2009 to 2014 were tied to some kind of kickback arrangement. ECF 34-4 at 43:4-13. It was Genuine Title's "business practice." *Id.* at 12:5-11.

Plaintiffs have also submitted additional evidence linking the Genuine Title kickback scheme to specific First Mariner employees. In addition to Sergei, Glickstein identified multiple other First Mariner loan officers who participated in a kickback arrangement with Genuine Title, including Brad Restivo, Rob Iobbi, Joseph Buchanan, and Walter Alton. ECF 34-18 at ¶ 8. Jay Zukerberg, former president of Genuine Title, also named Angela Pobletts as a First Mariner loan officer who received kickbacks in exchange for referrals to Genuine Title. ECF 34-10 at ¶ 4.

Prior to this motion, United States District Judge Richard D. Bennett granted First Mariner's Motion to Dismiss. ECF 13; 293 F. Supp. 3d 528 (D. Md. 2018). Judge Bennett found that the one-year statute of limitations barred Plaintiffs' RESPA claims, and further concluded that equitable tolling could not salvage the claims. 293 F. Supp. 3d at 540. However, the United States Court of Appeals for the Fourth Circuit reversed on appeal. *Edmondson v. Eagle Nat'l Bank*, 922 F.3d 535, 558 (4th Cir. 2019). Primarily, the Fourth Circuit found that Plaintiffs had sufficiently alleged that First Mariner engaged in affirmative acts of concealment, and thus the one-year statute of limitations might be tolled based on a theory of fraudulent concealment. *Id.* at 551–58. The panel remanded for further proceedings.

Plaintiffs now seeks certification of the following class of individuals who allegedly suffered harm under RESPA, 12 U.S.C. § 2607, as a result of the alleged kickback scheme First Mariner engaged in with Genuine Title:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by First Mariner Bank for which Genuine Title provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2009 and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2009 through December 31, 2014, was an employee, officer, member and/or agent of First Mariner Bank, Genuine Title LLC, Competitive Advantage Media Group LLC, Brandon Glickstein, Inc., and/or Dog Days Marketing, LLC.

ECF 34 at 1.

## II. LEGAL STANDARD

The "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Class actions are subject to Federal Rule of Civil Procedure 23(a), which requires that (1) the alleged class is so numerous that

3

joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the representatives' claims are typical of the claims of the class, and (4) the representatives will fairly and adequately protect the interests of the class. The party seeking certification carries the burden of demonstrating that it has complied with Rule 23. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). The four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequate representation—limit the class claims to those fairly encompassed by the named plaintiff's claims. *Dukes*, 564 U.S. at 349.

After satisfying the Rule 23(a) prerequisites, the plaintiffs must show that the proposed class action satisfies one of the enumerated conditions in Rule 23(b). *E.g.*, *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Here, Plaintiffs seek class certification pursuant to Rule 23(b)(3). Under that rule, a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Courts evaluating class certification "must rigorously apply the requirements of Rule 23." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998). Although the court's analysis must be "rigorous" and "may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Ct. Ret. Plans and Trust Funds*, 568 U.S. 455, 465-66 (2013) (citation omitted) (quoting *Dukes*, 564 U.S. at 351). The merits may be considered only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Id.* at 466.

4

### III.   ANALYSIS

#### A. Standing

As a preliminary matter, First Mariner asserts that the Plaintiffs have not suffered a concrete injury and therefore lack Article III standing. ECF 39 at 11-15. Standing is a doctrine rooted in the traditional understanding of an Article III "case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing consists of three elements: "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The burden is on the plaintiffs to establish these elements. *Id.*

Injury in fact is the "first and foremost" of standing's three elements. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Importantly, "[i]n a class action matter, we analyze standing based on the allegations of personal injury made by the named plaintiffs." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017); *see also Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) ("The strictures of Article III standing are no less important in the context of class actions.").

Since *Spokeo*, it is clear that plaintiffs may not satisfy the strictures of Article III by alleging "a bare procedural violation." 136 S. Ct. at 1549. Rather, plaintiffs must have suffered a concrete harm as a result of the "defendant's statutory violation that is the type of harm Congress sought to prevent when it enacted the statute." *Baehr*, 953 F.3d at 253 (quoting *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240-41 (4th Cir. 2019)). The Fourth Circuit has explained, that under

5

RESPA, "the deprivation of impartial and fair competition between settlement services providers" is not the kind of harm Congress sought to prevent and, thus, will not confer Article III standing. *Id.* at 254. Rather, "the harm it sought to prevent is the increased costs . . . for settlement services." *Id.* (holding that deprivation of fair competition "untethered from any evidence that the deprivation increased settlement costs—is not a concrete injury under RESPA"); *see also Edmondson v. Eagle Nat'l Bank*, Civil Case No. SAG-16-3938, 2020 WL 3128955, at *3 (D. Md. June 12, 2020).

First Mariner argues that Plaintiffs' claim that they were overcharged for settlement services is not supported by any "plausible facts." ECF 39 at 13. First Mariner points to Zukerberg's deposition testimony in which he stated that the costs simply "came out of [Genuine Title's] profits," ECF 39-5 at 38:4, and, so, Genuine Title, and not its customers, bore any cost of the kickback scheme. Plaintiffs, on the other hand, contend that Zukerberg's previous statements show that even if its fees were not "gross" overcharges, Genuine Title would have charged lower rates absent the kickback arrangement. ECF 44 at 3-4. Although Zukerberg stated that he believed Genuine Title's rates were "competitive" with other title companies, ECF 44-2 at 70:7-8, he also admitted that he, "like any other business tried to get top dollar for your fee," *id.* at 68:1-5. He testified that he would have preferred "to give the borrower back a couple extra hundred dollars instead of paying it to them [those with whom Genuine Title had kickback agreements]." *Id.* at 70:3-8.

In arguing that Genuine Title would have charged them a lower fee had it not been accounting for its kickback payments, Plaintiffs have alleged more than a bare statutory violation. *See Donaldson v. Primary Residential Mortg., Inc.*, No. ELH-19-1175, 2020 WL 3184089, at *19 (D. Md. June 12, 2020) (holding that plaintiffs' claim that they paid higher prices because of a kickback arrangement giving rise to a RESPA violation alleged a concrete injury). Indeed,

6

Plaintiffs have also presented additional, corroborating evidence indicating that they may have been significantly overcharged. According to her HUD-1 form, Bezek paid $910 for her title examination and title abstract fees. ECF 44-5. Based on data from the Department of Housing and Urban development, these fees were more than twice the average rate and more than eighty percent higher than fees in the eightieth percentile in 2010 in Maryland, a state with some of the highest fees in the country. ECF 44-4. Harris was charged $1200 for her title and examination and title abstract, more than twice as much as the eightieth percentile fee. ECF 34-20; ECF 44-4.

The Court expresses no view at this time as to whether Bezek, Harris, or any of the putative class members were actually overcharged for the services rendered by Genuine Title. The Court merely concludes that at this stage of the proceedings, Plaintiffs have proffered enough evidence to meet the requirements of Article III standing. As more factual development occurs, it may become clear that Plaintiffs were not overcharged for title and settlement services. Accordingly, First Mariner may continue to challenge Plaintiffs' Article III standing as this litigation proceeds, particularly at the summary judgment stage. *See Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (explaining that the elements of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation").

### B. Class Certification

#### 1. Readily Identifiable

In the Fourth Circuit, any proposed class must be "readily identifiable," which other courts refer to as "ascertainability." *EQT Prod.*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). In other words, a proposed class's definition must allow a court to "readily identify the class members in reference to objective criteria." *Id.* Notably, the plaintiff "need not be able to identify every class member at the time of certification." *Id.* The class definition must simply "ensure that there will be some 'administratively feasible [way] for the

court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT Prod.*, 764 F.3d at 358). Only if a class definition renders it "impossible" to identify class members "without extensive and individualized fact-finding or 'mini-trials'" is a class action inappropriate. *EQT Prod.*, 764 F.3d at 358 (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-94 (3d Cir. 2012)).

The proposed class is defined by simple, objective criteria: all members of the class (1) received federally related loans brokered by First Mariner between January 1, 2009 and December 31, 2014 and (2) received settlement services from Genuine Title. These criteria are easily discernable in the government-required HUD-1 forms and First Mariner's loan documents. In fact, Plaintiffs have already identified most class members through data obtained from Genuine Title. *See* ECF 34-8; ECF 34-9. Thus, this Court concludes that Plaintiffs have shown that the class is readily identifiable. *See Krakauer*, 925 F.3d at 650, 658 (finding, in a class action suit brought under the Telephone Consumer Protection Act of 1991, that documentation showing every person whose name was on the relevant Do-Not-Call registries for at least 30 days, and had received two calls in a single year, "obviated any [ascertainability] concern[s]").

First Mariner argues that the class is overbroad because Plaintiffs have not yet proven that every loan was tainted by a RESPA violation. According to First Mariner, half of the loans identified by Plaintiffs for inclusion in the class are not connected to the six First Mariner employees currently identified as accepting kickbacks from Genuine Title. Plaintiffs, however, assert that eighty-five percent of the loans identified (283 loans) are directly tied to one of the referral-and-kickback agreements documented in the undisputed Zukerberg and Glickstein affidavits. ECF 44 at 11. Glickstein stated that the kickbacks were given based on loans referred from one of the loan officer's "groups." *See* ECF 34-18 at ¶ 8 ("For each loan that Sergei's *group*

assigned . . . Genuine Title would pay around a $200 kickback." (emphasis added)). Plaintiffs have used the National Multistate Licensing System ("NMLS") to identify which First Mariner brokers worked with those named by Glickstein and Zukerberg, and claim that all of the loans generated by those brokers were also exchanged for a kickback from Genuine Title. ECF 44 at 10-11. Regardless, Plaintiffs need not prove their entire case before the Court finds the class identifiable.

Plaintiffs have adduced sufficient evidence, at this stage, to show that a common scheme of kickbacks existed between First Mariner and Genuine Title. Whether the evidence, upon the conclusion of discovery, shows that only those class members whose loans were handled by particular loan officers actually suffered an injury, does not impact the administrative ease with which this Court can ascertain each class member's existence, and provide them notice. *See Krakauer*, 925 F.3d at 658. Put differently, questions surrounding the *merits* of each class member's claim do not, in this case, impact the Court's ability to ascertain *ex ante* whether each person qualifies as a member under Plaintiffs' proposed class definition, or the ability to notify those individuals about the lawsuit.[1]

### 2. Rule 23(b)(3)

Plaintiffs have moved to certify a class under Rule 23(b)(3), in which "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). As a result, Rule 23(b)(3) class actions "must meet predominance and superiority requirements not imposed on other kinds of class actions."

---

[1] First Mariner also argues the class is not ascertainable because some of the loans in the class definition may be statutorily exempt from RESPA. ECF 39 at 17-19. The Court will address this concern in its discussion of the Rule 23(b)(3) predominance requirement, but it similarly does not impact ascertainability.

*Gunnells*, 348 F.3d at 424. Importantly, "[i]n a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions.'" *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997)). Thus, the Court analyzes predominance and commonality together, and will begin with that inquiry before returning to the remaining requirements of Rule 23(a). *See, e.g.*, *Romeo v. Antero Res. Corp.*, No. 1:17CV88, 2020 WL 1430468, at *8 (N.D. W. Va. Mar. 23, 2020) ("[T]he Court will consider commonality in its discussion of predominance.").

<u>Predominance of Common Questions</u>

To satisfy predominance, common questions must have significant "bearing on the central issue in the litigation." *EQT*, 764 F.3d at 366. In other words, the requirement is met where all class members' claims "depend upon a common contention," and establishing "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Here, the essence of each proposed class member's claim against First Mariner is that First Mariner referred them to Genuine Title for settlement services because Genuine Title promised to, and actually did, provide cash or other kickbacks to First Mariner in accordance with a prior common agreement. Whether this widespread scheme existed and, if so, how it was executed are common questions "at the heart of the litigation" that will produce common answers. *See EQT*, 764 F.3d at 366.

Still, First Mariner raises several issues that it believes will destroy predominance, including whether (1) each class member has standing, (2) each class member exercised due diligence to invoke equitable tolling, (3) First Mariner's vicarious liability defense applies, (4)

each class member's loan is subject to RESPA, and (5) each class member was referred to Genuine Title pursuant to a kickback arrangement.[2]  The Court ultimately concludes that none of these issues will destroy predominance, and will address each of these objections in turn.

First, First Mariner argues that the Court will be drawn into separate analyses of whether each class member has standing. ECF 39 at 20-21. However, as discussed above, Plaintiffs have sufficiently alleged that they and other proposed class members have suffered a concrete injury. Plaintiffs' injury is not that they "paid too much" relative to some objectively reasonable fee. *See id.* at 21. Instead, Plaintiffs' purported injury is that they paid more for settlement services than they would have absent the kickback arrangement. Therefore, the Court need not delve into the intricacies of every class member's transaction to determine the reasonableness of the charges, and establishing standing will not destroy predominance.

Next, First Mariner contends that determining whether each borrower exercised due diligence in bringing his or her claim will require individual inquiries. *Id.* at 21-25. As explained in other related cases, the Court can assess, collectively, whether the available information and media reporting related to prior litigation and enforcement proceedings would have prompted a reasonable person to uncover the facts substantiating Plaintiffs' RESPA claims. *See Dobbins v. Bank of America, N.A.*, Civil Case No. SAG-17-0540, 2020 WL 5095855, at *7 (D. Md. Aug. 28, 2020); *Edmondson*, 2020 WL 3128955, at *5-7. Unlike in *Thorn v. Jefferson-Pilot Ins. Co.*, in which the Fourth Circuit found it impossible to determine whether 1.4 million consumers "spread out geographically over four states and temporally over 62 years" acted with due diligence, the

---

[2] In its Opposition, First Mariner couches some of these objections under the Rule 23(a) typicality requirement. ECF 39 at 20-27. The typicality and adequacy requirements "tend to merge" with commonality, *Broussard*, 155 F.3d at 337, and this Court will discuss the objections under commonality and predominance.

11

range of borrowers in this case, and their particular media exposure, is far more limited in time and geography.  445 F.3d 311 (4th Cir. 2006).  The Court is not convinced at this stage that individual hearings will be necessary to determine whether class members encountered information that would have prompted them to uncover the facts substantiating their RESPA claims.  Certainly, however, the Court reserves the right to decertify the class action if later factual development reveals that individual class members were uniquely situated such that disparate inquiries into their due diligence, or any other material issue, predominates over common questions.  *See Minter v. Wells Fargo Bank, N.A.*, Civil Action No. WMN-07-3442, 2013 WL 1795564, at *3 (D. Md. Apr. 26, 2013) ("When the Court certified the Tolling Class it noted it was possible that proving equitable tolling might become unmanageable and thus warrant the Court's exercise of discretion to decertify the class.").

Additionally, First Mariner argues that its defense to vicarious liability "will vary depending on the [First] Mariner loan officer who worked with the borrower."  ECF 39 at 26-27.  However, First Mariner's assertion appears purely hypothetical.  Indeed, First Mariner contends that it is not vicariously liable for the alleged misconduct of *any* of the loan officers who entered into kickback agreements with Genuine Title.  *Id.* at 27.  It proffers, without explanation, that its defense may vary depending on ancillary circumstances such as "whether the arrangement was memorialized in writing, whether payments were made by or to sham entities, etc." *Id.*  The nature of the alleged conduct of all the loan officers, however, is largely the same.  The Court is, therefore, not convinced that the vicarious liability of First Mariner for each loan officer will be decided by burdensome individual inquiries, but rather is a common question applicable to all class members.

Similarly, First Mariner argues that because it is possible that some "federally related" loans are not subject to RESPA, determining whether each loan in the proposed class is governed

by RESPA will require a "mini trial." *See* ECF 39 at 17-19. Indeed, RESPA does not apply to mortgages on residential property acquired "primarily for business, commercial, or agricultural purposes," among other exemptions. 12 U.S.C. § 2606(a); 12 C.F.R. § 1024.5(b). While it is possible that some putative class members' loans will fall within a relevant exemption, the Court is not persuaded that this number will exceed a negligible percentage of loans encompassed by the class definition. Based on Genuine Title's loan processing data, Plaintiffs have determined that sixty-five percent of the loans identified as falling within the proposed class definition are either VA refinance loans or FHA loans, both of which impose limitations that would render RESPA's exemptions inapplicable. *See, e.g.*, ECF 44 at 16, 16 n.8 (describing restrictions for VA refinance loans). Defendants merely hypothesize, with no support, that some loans may fall within a RESPA exemption. However, Plaintiffs contend that the information needed to determine whether a RESPA exemption applies is contained in the loan application forms in the custody and control of First Mariner. ECF 44 at 17. Plaintiffs sought discovery of information that would show whether any of the identified loans were exempt from RESPA, but First Mariner objected to their interrogatories because, among other reasons, it believed the questions were "premature" where the class had not yet been certified. ECF 44-6 at 10-12. Plaintiffs have proffered enough evidence at this stage to show that only a minority of loans could fall outside of RESPA's statutory boundaries. This Court will not deny certification based on First Mariner's bald assertion that further evidence could prove otherwise, given that the relevant evidence was within First Mariner's control and was not produced. Moreover, if it becomes necessary, the parties can discern which class members' loans fall within a RESPA exemption through other ordinary discovery processes (with a survey, for example) without the need for court-sponsored individualized hearings. In any

event, this issue regarding RESPA exemptions does not predominate over the numerous, imperative questions that are answerable on a class-wide basis.

Finally, First Mariner contends that individual inquiries are necessary to prove that each class member chose to use Genuine Title based on a referral from First Mariner, and not due to some unrelated reason. However, a RESPA referral "need not be the exclusive or even the primary reason that influenced a home buyer's choice of a real estate service provider." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1184 (9th Cir. 2015) (interpreting implementing regulation 24 C.F.R. § 3500.14(f)); *Palombaro v. Emery Fed. Credit Union*, No. 1:15-cv-792, 2017 WL 3437559, at *11-12 (S.D. Ohio Aug. 10, 2017) (finding common questions predominated over the proposed class even where a class member may have chosen Genuine Title prior to a referral). Ultimately, whether a kickback arrangement between Genuine Title and First Mariner had any impact on borrowers' choice of title company is a common question that predominates over potential individual inquiries.

In sum, none of the issues raised by First Mariner destroy the predominance of common questions pertinent to each class members' claim. Indeed, some tend to identify more common questions. First Mariner may ultimately prove that a common agreement and pattern of practice, central to Plaintiffs theory of liability, did not exist, or were not as pervasive as alleged, but doing so will involve questions of law and fact common to all class members.

<u>Superiority</u>

In addition to finding that common questions predominate under Rule 23(b), the Court finds that the class action vehicle is "superior to other methods" of adjudicating this controversy. *See* Fed. R. Civ. P. 23(b)(3). Based upon the common questions that predominate, as explained

above, a class action is more efficient than allowing potentially hundreds of individual claims arising from this purported kickback arrangement.

### 3. Rule 23(a)

Numerosity

Plaintiffs have identified over 250 loans that meet the objective class criteria, and First Mariner does not dispute that the numerosity requirement is met. Thus, the Court finds that there are sufficiently numerous proposed class members.

Typicality

The typicality requirement in Rule 23 requires that "claims or defenses of representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This prerequisite "goes to the heart of a representative parties' [sic] ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). For that reason, the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Id.* The representative plaintiff's claims "need not be 'perfectly identical or perfectly aligned'" with other class members' claims, but "the representative's pursuit of his own interests 'must simultaneously tend to advance the interests of the absent class members.'" *Ealy v. Pinkerton Gov't Servs. Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (unpublished) (quoting *Deiter*, 463 F.3d at 466). This analysis "tend[s] to merge" with adequacy and commonality. *See Broussard*, 155 F.3d at 337 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982)).

As discussed above, Plaintiffs allege First Mariner has harmed all putative class members by violating the same statutory provision based on a common scheme between First Mariner and Genuine Title. Although class members may have worked with different loan officers, proof that

15

the named Plaintiffs' loan officer received a kickback from Genuine Title based on a referral would tend to advance the argument that other loan officers were similarly involved. Other minor differences, such as the form of kickback received by each loan officer, similarly do not make Plaintiffs' claims materially different from those of other class members. *See Broussard*, 155 F.3d at 338 (explaining that class certification primarily requires the class representative to have the "same interest" and "same injury" as other class members); *Palombaro*, 2017 WL 3437559 at *7 (finding the typicality requirement met where proposed RESPA class members worked with different loan officers because "[d]ifferences in the form or amount of kickback are not relevant to whether [the defendant's] overall conduct, if otherwise uniform and proven, is culpable"). Moreover, First Mariner has not alleged, and this Court does not find, any conflict of interest that would impair Plaintiffs from advancing the claims of the entire class.

<u>Adequate Representation</u>

Finally, Plaintiffs must illustrate that they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). First Mariner argues that Bezek and Harris are inadequate representatives because they lack independent knowledge about their claims. ECF 39 at 28-29. However, the Fourth Circuit has recognized that a plaintiff "need not have extensive knowledge of the facts of the case in order to be an adequate representative," particularly in a "complex case." *Gunnells*, 348 F.3d at 430; *see also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 676, 683-84 (D. Md. 2018); *Benway v. Res. Real Estate Servs., LLC*, 239 F.R.D. 419, 425-26 (D. Md. 2006). Bezek and Harris have relied significantly on their attorneys to understand the intricacies of the RESPA statute and their potential relief, but this does not disqualify them as adequate representatives.

Similarly, First Mariner argues that Bezek and Harris have not done enough to supervise the litigation because, for example, Harris does not know how many motions have been filed in the case, and Bezek has not reviewed documents produced in discovery. ECF 39 at 29. "However, 'Rule 23 does not require the representative plaintiffs to have extensive knowledge of the intricacies of litigation, rather, the named plaintiffs must have a general knowledge of what the action involves and a desire to prosecute the action vigorously.'" *Fangman v. Genuine Title LLC*, Civil Action No. RDB-24-0081, 2016 WL 6600509, at *11 (D. Md. Nov. 8, 2016) (quoting *Benway*, 239 F.R.D. at 425-26). The Court notes that both Bezek and Harris attended the telephonic hearing on this motion to certify the class, demonstrating their interest and involvement in the case. The Court concludes that none of the knowledge deficiencies identified by First Mariner show Bezek and Harris are not willing and able to represent the class.

Additionally, Plaintiffs' counsel, which is largely the same counsel for the class certified in *Dobbins*, 2020 WL 5095855, *Edmondson*, 2020 WL 3128955, *James v. Acre Mortg. & Fin., Inc.*, Civil Case No. SAG-17-1734, 2020 WL 2848122, at *1 (D. Md. June 2, 2020), and *Fangman*, 2016 WL 6600509, will adequately represent the proposed class.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs' Motion to Certify Class, ECF 34, is GRANTED. An accompanying Order follows.

Dated: October 2, 2020

/s/
Stephanie A. Gallagher
United States District Judge