## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td><strong>JILL BEZEK</strong>, <em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td><strong>Plaintiffs,</strong></td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td><strong>v.</strong></td><td>*</td><td><strong>Civil No. SAG-17-2902</strong></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td><strong>FIRST NATIONAL BANK OF</strong></td><td>*</td><td></td></tr>
<tr><td><strong>PENNSYLVANIA,</strong></td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td><strong>Defendant.</strong></td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Jill Bezek and Michelle Harris (collectively "Plaintiffs") represent a class of borrowers who had a federally related loan serviced by First Mariner Bank ("First Mariner"). Plaintiffs assert that First Mariner and its employees violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, by referring loans to a title services provider, Genuine Title, in exchange for kickbacks. Defendant First National Bank of Pennsylvania ("Defendant"), the successor in interest to First Mariner by and through its merger with Howard Bank, has filed a motion asking this Court to grant summary judgment in its favor on all claims and to decertify the class previously certified on October 2, 2020. ECF 94. Plaintiffs oppose the motion and seek partial summary judgment establishing Defendant's successor liability and identifying the class membership. ECF 97. The parties have also filed motions to seal certain exhibits pursuant to existing confidentiality orders. ECF 98, 113. Finally, Plaintiffs have filed a motion for leave to file a surreply, ECF 109, which Defendant has opposed, ECF 112.

This Court has reviewed the parties' motions, oppositions, replies, and the exhibits attached thereto. *See* ECF 99, 101, 102, 106, 114. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021).

For the reasons below, Defendant's Motion for Summary Judgment and Decertification will be granted in part and denied in part. Specifically, while Defendant is entitled to partial summary judgment with respect to certain class member claims and the appropriate measure of RESPA damages, the remainder of the motion will be denied. Plaintiffs' cross motion for summary judgment will also be granted in part and denied in part. Finally, Plaintiffs' surreply motion and the parties' motions to seal will be granted.

## I.      FACTUAL BACKGROUND

At the time of the relevant events, First Mariner was a Maryland corporation and independently owned bank. ECF 1 ¶ 7; ECF 28 ¶ 7. Genuine Title was a title services company operating in Maryland. ECF 99-9 ¶¶ 2, 3. Plaintiffs Bezek and Harris are Maryland residents who refinanced their mortgages with First Mariner. ECF 101-18 at 3; ECF 101-19 at 3. Plaintiffs allege that, from 2009 through 2014, First Mariner brokers referred 276 loans (including their own) to Genuine Title for title settlement services as part of an illegal kickback scheme. *See* ECF 97-1 at 17; ECF 101-1 through ECF 101-9. As explained by Genuine Title's former president, Jay Zukerberg, and another Genuine Title employee, Brandon Glickstein, part of Genuine Title's regular business model included the payment of cash kickbacks, marketing credits, and other things of value to lenders in exchange for their referring loans to Genuine Title. ECF 99-13 at 26:13-27:4. 184:7-12; ECF 99-14 at 12:5-11, 15:21-17:13, 29:4-29:11.

Plaintiffs' refinance loans with First Mariner were both originated by Anthony Sergi, a loan officer at First Mariner's Ellicott City and White Marsh branches. ECF 101-18 at 3; ECF 101-19 at 3, ECF 99-21 ¶ 3. In a sworn declaration, Sergi stated that in late 2009 or early 2010, he started receiving payments from Genuine Title in exchange for loan referrals. ECF 99-21 ¶ 14. While First Mariner borrowers had the right to choose their own title company, Sergi would elect

2

the title company when his borrowers declined this choice. *Id.* ¶¶ 5, 7. Sergi received a payment of approximately $200 from Genuine Title for each loan he referred to the company. ECF 99-20 ¶ 14; ECF 99-21 ¶ 13.[1] This amount was paid directly to Sergi, either by Glickstein or through companies owned by Glickstein, in the form of personal checks made out to Sergi. ECF 99-20 ¶ 12; ECF 99-21 ¶ 13; ECF 99-24 ¶ 8(a). Glickstein stated in a declaration that Genuine Title's referral agreement with Sergi was in place "the entire time that Sergei [sic] was employed with First Mariner" and that "every loan Sergei [sic] assigned and referred to Genuine Title would have resulted in a kickback," ECF 99-24 ¶ 8(a); however, Sergi's later declaration refutes both these points, ECF 99-21 ¶¶ 10, 13. Sergi said in that same declaration that he did not disclose the kickback payments to his superiors at First Mariner. ECF 99-21 ¶ 14. He also stated, however, that he believed his branch manager at First Mariner's White Marsh branch knew about and may have received similar kickbacks from Genuine Title. *Id.* ¶ 15, ECF 99-20 ¶ 13.

Plaintiffs' loans were referred to Genuine Title by Sergi, after they both declined to choose their own title companies. ECF 94-2 at 111:7-112:11; ECF 94-4 at 65:4-66:6. Bezek's refinance loan closed in December, 2010. ECF 94-3 at 2. Genuine Title charged her $1,675 for title services. *Id.* at 3. That total included (among other charges) $910 in title exam and abstract fees, as well as $480 for title insurance. *Id.* Harris's loan closed in October, 2012. ECF 94-5 at 2. Genuine Title

---

[1] The parties have submitted numerous declarations from former employees of First Mariner and Genuine Title, some of which contain contradictory or inconsistent statements. For example, in his July 19, 2021 declaration obtained by Plaintiffs, Sergi states that he was paid $200 for each referral, whereas his August 20, 2021 declaration obtained by Defendant states that he did not receive a payment for every loan referred to Genuine Title. ECF 99-20 ¶ 14; ECF 99-21 ¶ 13. Of course, in considering these and other discrepancies, the Court remains mindful that summary judgment may not be granted when conflicting statements in affidavits raise a genuine issue of material fact. *Am. Metal Forming Corp. v. Pittman*, 52 F.3d 504, 507 (4th Cir. 1995).

charged her $1,802.12 for title services. *Id*. at 3. That total included $1,200 in title exam and abstract fees, as well as $267.12 for title insurance. *Id*.

Plaintiffs also introduced evidence indicating that other First Mariner employees, in addition to Sergi, accepted cash kickbacks or other items of value from Genuine Title in exchange for referring loans:

- Bradley Restivo, a former loan officer at First Mariner's Bel Air and Loch Raven branches, stated in declarations that in October, 2012, he began referring loans to Genuine Title in exchange for marketing credits of around $100-200 per loan from Glickstein or one of his companies. ECF 94-8 ¶¶ 3, 11; 94-9 ¶¶ 1-3, 10. Glickstein also stated that Restivo received marketing credits in exchange for loan referrals. ECF 99-24 ¶ 8(b).

- Walter Alton, who was employed in 2010 as a loan officer at First Mariner's Canton branch, stated in declarations that he received a payment of around $100 from Glickstein or his companies for each loan he referred to Genuine Title. ECF 99-16 ¶¶ 1, 10, 11, 13. Glickstein also stated that Alton received cash payments in exchange for loan referrals. ECF 99-24 ¶ 8(d).

- Glickstein stated in declarations that Genuine Title had similar referral agreements to provide cash or marketing credits to First Mariner loan officers Robert Iobbi, Joseph Buchannan, Tom Bowen, and Jon Cohen. ECF 94-18 ¶ 8; ECF 99-24 ¶ 8(c).[2]

- In his declaration dated April 28, 2022, Glickstein also identified 15 loans that were referred by First Mariner to Genuine Title through an intermediary named Brian Boateng. ECF 94-18 ¶ 9, ex. A. Loan documents indicate that the First Mariner employees associated with these loans were employed in the bank's Eldersburg branch. ECF 101-13. Glickstein averred that "[b]ased on my personal experience working with Brian Boateng, it is more likely so than not so that the referral of these loans . . . were [sic] pursuant to" an illegal kickback arrangement. *Id*. ¶ 9.

- Zukerberg averred that Genuine Title had a cash kickback arrangement in 2012 and 2013 with another First Mariner employee, Angela Pobletts, and that all loans referred to Genuine Title by Pobletts were labeled "1st Mariner – Theresa Frederick's Branch." ECF 94-16 ¶¶ 4-8. Theresa Frederick was the name of Pobletts's loan processor. *Id*. ¶ 7. Zukerberg also stated that Pobletts was paid on a monthly basis according to a formula based on the total charges to borrowers on

---

[2] Defendant has submitted a declaration from Iobbi in which he denied receiving any kickbacks from Genuine Title. ECF 94-12 ¶¶ 6-8.

the loans Pobletts assigned and referred. *Id.* ¶¶ 4, 5.[3] At deposition, Pobletts invoked her "constitutional privilege against self-incrimination" and declined to answer questions. ECF 99-23 at 30:3-31:8.

In a Memorandum Opinion and Order issued on October 2, 2020, this Court granted Plaintiffs' Motion to Certify Class pursuant to Rule 23 of the Federal Rules of Civil Procedure. ECF 47, 48. Specifically, Plaintiffs received certification of the following class of individuals (the "First Mariner Class") who allegedly suffered harm under RESPA as a result of the alleged kickback scheme between First Mariner and Genuine Title:

> All individuals in the United States who were borrowers on a federally related mortgage loan (as defined under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602) originated or brokered by First Mariner Bank for which Genuine Title provided a settlement service, as identified in Section 1100 on the HUD-1, between January 1, 2009 and December 31, 2014. Exempted from this class is any person who, during the period of January 1, 2009 through December 31, 2014, was an employee, officer, member and/or agent of First Mariner Bank, Genuine Title LLC and/or Competitive Advantage Media Group LLC.

ECF 48, *see also* ECF 47 at 7-17. This Court also rejected Defendant's argument that Plaintiffs lacked Article III standing, concluding that Plaintiffs had alleged sufficient facts indicating that they suffered an actual injury-in-fact—namely, that they were overcharged for title services as a result of the kickback scheme. ECF 47 at 5-7. However, the Court noted that "as more factual development occurs, it may become clear that Plaintiffs were not overcharged for title and settlement services," and therefore "[Defendant] may continue to challenge Plaintiffs' Article III standing as this litigation proceeds, particularly at the summary judgment stage." *Id.* at 7.

---

[3] Specifically, Zukerberg stated that the formula was calculated by taking the total charges to the borrowers on loans referred, subtracting $500-600 for costs and overhead, and then dividing by 2. ECF 94-16 ¶ 4.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Casey*, 823 F. Supp. 2d at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Summary judgment shall also be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished). In ruling on a motion for summary

judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

In addition to the parties' cross-summary judgment motions, Defendant seeks to decertify the First Mariner Class. ECF 94. "An order that grants or denies class certification may be altered or amended before final Judgment." Fed. R. Civ. P. 23(c)(1)(C). "Indeed, 'an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate." *Minter v. Wells Fargo Bank, N.A.*, No. CIV.A. WMN-07-3442, 2013 WL 1795564, *2 (D. Md. Apr. 26, 2013) (quoting *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir.1990)). However, "commentators have cautioned that courts should be wary of motions to decertify which simply reargue certification 'in the absence of materially changed or clarified circumstances.'" *Id*. (quoting 3 Newberg on Class Actions § 7:47 (4th ed. 2012) (alteration adopted)).

"[A] motion to decertify is reviewed against the same standards as a motion to certify (i.e., the requirements of [Federal Rule of Civil Procedure 23])." *Id*. (citing *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 544 (E.D. Va. 2000)). Specifically, Rule 23(a) requires that (1) the alleged class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the representatives' claims are typical of the claims of the class, and (4) the representatives will fairly and adequately protect the interests of the class. After satisfying the Rule 23(a) prerequisites, the plaintiffs must show that the proposed class action falls within one of the categories enumerated in Rule 23(b). *E.g., Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Here, Plaintiffs sought and were granted class certification pursuant to

Rule 23(b)(3). Under that rule, a class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### III.   ANALYSIS

#### A.  Proposed Surreply

As a preliminary matter, this Court will begin by analyzing Plaintiffs' motion for leave to file a surreply, ECF 109. Generally, surreplies are not permitted unless ordered by the Court. Local Rule 105.2(a) (D. Md. 2021); *Trimgen Corp. v. Iverson Genetic Diagnostics, Inc.*, No. CIV.A. RDB-14-2850, 2015 WL 2165118, at *2 (D. Md. May 7, 2015). "A party moving for leave to file a surreply must show a need for a surreply." *MTB Servs., Inc. v. Tuckman-Barbee Const. Co.*, No. 1:12-cv-02109–RDB, 2013 WL 1224484, *6 (D. Md. Mar. 26, 2013). Such a need exists if "a defendant raises new legal issues or new theories in its reply brief." *Id.* Surreplies may also be allowed "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Id.* (quoting *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003)).

Plaintiffs contend that a surreply is necessary to address three arguments raised for the first time in Defendant's reply in support of its motion for summary judgment and decertification: (1) that Plaintiffs abandoned or waived their claim that Bezek and Harris have standing; (2) that an exhibit submitted by Plaintiffs purporting to show the 80th percentile cost of title services in various states is inadmissible; and (3) that Sergi, the First Mariner employee who originated Plaintiffs'

loans, was employed in a different capacity and at a different First Mariner branch than one identified by Defendant during the relevant time period.[4]

This Court agrees with Plaintiffs that a surreply is necessary to properly address these new theories and assertions presented in Defendant's reply brief. In particular, the first and second issues are central to the parties' dispute over whether Plaintiffs have introduced sufficient evidence to establish Article III standing. *See Trimgen Corp.*, 2015 WL 2165118, at *2 (granting a motion for leave to file a surreply where the Defendant's newly raised assertions were a "key consideration" in the court's jurisdictional analysis). Accordingly, Plaintiffs' motion for leave to file a surreply, ECF 109, will be granted.[5]

### B. Motions for Summary Judgment

#### 1. Named Plaintiffs' Claims

Defendant seeks summary judgment on Plaintiffs' individual claims on two grounds. First, it argues that First Mariner cannot be held vicariously liable for the kickbacks accepted by the Plaintiffs' loan officer, Sergi. Second, Defendant asserts that Plaintiffs lack standing because they have not introduced admissible evidence showing that they suffered an injury-in-fact as a result of the kickbacks.

##### i. *Vicarious Liability*

To prove their RESPA claims pursuant to 12 U.S.C. § 2607(a), Plaintiffs must show "(1) a payment of a thing of value, (2) given and received pursuant to an agreement to refer settlement

---

[4] Though not addressed in the remainder of this opinion, this Court agrees with Plaintiffs that the evidence indicates that Sergi worked at First Mariner's White Marsh branch—not its Bel Air branch—and was briefly a sales manager in 2014. ECF 99-20 ¶ 3; ECF 99-21 ¶ 2,3.

[5] In addition to Plaintiff's surreply, ECF 109-1, this Court has also considered the arguments set forth in Defendant's opposition and supplemental response to the surreply, ECF 112, and Plaintiff's reply in support of its motion for leave to file a surreply, ECF 114.

business, and (3) an actual referral." *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 WL 6600509, at *12 (D. Md. Nov. 8, 2016) (citing *Galiano v. Fidelity Nat'l Title Ins. Co.*, 684 F.3d 309, 314 (2d Cir. 2012)).[6]  Defendant argues that Plaintiffs cannot show that First Mariner—as opposed to Sergi, acting on his own and without his superiors' knowledge—accepted any kickback or was party to any referral agreement with Genuine Title in connection with Plaintiffs' loans. Plaintiffs respond that even if First Mariner did not sanction the kickbacks or directly benefit from them, it is nonetheless vicariously liable for Sergi's actions.

The Supreme Court has looked to the general common law of agency to determine whether an employer may be vicariously liable for its employees' violations of federal law. *See Meyer v. Holley*, 537 U.S. 280, 285-86 (2003). "To determine these common law principles, courts have traditionally looked to the Restatement of Agency." *Hodgin v. UTC Fire & Sec. Americas Corp., Inc.*, 885 F.3d 243, 252 (4th Cir. 2018); *see also Christiana Trust v. Riddle*, 911 F.3d 799, 803 (5th Cir. 2018) (applying Restatement (Third) of Agency to a RESPA vicarious liability claim). Under the Third Restatement, "[a]n employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment." Restatement (Third) of Agency § 7.07(1) (2006). An employee acts within the scope of employment when "performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." *Id*. at §7.07(2). The scope of employment "has been defined to include all those acts falling within the employee's or agent's general line of work, when they are motivated—at least in part—by an intent to benefit the corporate employer." *United States v. Singh*, 518 F.3d 236, 249 (4th Cir. 2008)); *see also*

---

[6] In full, 12 U.S.C. § 2607(a) provides that: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

*Bowen v. Adidas Am., Inc.*, No. 3:18-3118-JFA, 2020 WL 13076108, at *9 (D.S.C. Feb. 27, 2020); *United States v. Automated Med. Labs.*, 770 F.2d 399, 406-07 (4th Cir.1985) (stating that scope of employment "has been broadly defined to include acts on the corporation's behalf in performance of the agent's general line of work"). Conversely, "an act of a servant is not within the scope of employment if it is 'within an independent course of conduct not intended by the employee to serve any purpose of the employer.'" *United States v. Hilton*, 701 F.3d 959, 970 (4th Cir. 2012) (quoting Restatement, *supra*, § 7.07(2)).

Defendant argues that the kickbacks Sergi received from Genuine Title were part of an independent course of conduct undertaken solely for his personal benefit. Specifically, Defendant notes that the kickbacks were paid to Sergi in the form of personal checks made out to him, and that Sergi stated in one of his declarations that he never disclosed the agreement to First Mariner. ECF 94-7 ¶ 14. Defendant further contends that First Mariner did not in any way benefit from the arrangement between Sergi and Genuine Title, because Plaintiffs' mortgage loans were already approved and would have closed regardless of which title company was ultimately used. ECF 102 at 10. Finally, Defendant argues that company policy expressly required Sergi to comply with RESPA, *see* ECF 94-6, Ex. 1 at 3, Ex. 2 at 3, meaning his actions could not logically be within the scope of his duties.

Defendant's arguments are insufficient to establish, as a matter of law, that Sergi's kickback-referral arrangement was outside the scope of his employment. *See Ashland Facility Operations, LLC v. N.L.R.B.*, 701 F.3d 983, 990 (4th Cir. 2012) ("Generally, whether an agency relationship exists is a factual determination."); *Richardson v. All. Residential Co.*, No. CV ELH-18-1114, 2020 WL 2061512, at *8 (D. Md. Apr. 29, 2020) ("[T]he existence of an agent-principal relationship and the scope of an agent's authority are factual questions and so are ordinarily within

the purview of the factfinder."). As an initial matter, an employee's actions may be within the scope of employment "even if . . . such acts were against corporate policy or express instructions." *United States v. Basic Constr. Co.*, 711 F.2d 570, 573 (4th Cir. 1983); *see also Richardson*, 2020 WL 2061512, at *8 ("Notably, the Restatement teaches that 'conduct is not outside the scope of employment merely because an employee disregards the employer's instructions.'" (quoting Restatement, *supra*, § 7.07 cmt. c.)). Therefore, the fact that First Mariner required Sergi to comply with RESPA is not determinative of whether his conduct was outside the scope of his employment. Rather, the appropriate inquiry is whether Sergi's conduct (1) fell within his general line of work and (2) was undertaken at least in part for First Mariner's benefit. *See Singh*, 518 F.3d at 249; *Bowen*, 2020 WL 13076108, at *9; Restatement, *supra*, § 7.07(2).

To the first point, Plaintiffs have pointed to evidence indicating that Sergi's illegal referrals occurred within, or were incidental to, his general line of work with First Mariner. As First Mariner's corporate representative testified, the job of loan officers such as Sergi was "to originate loans." ECF 101-10 at 59:4-5. Thus, First Mariner employee incentive plans, which are attached to Sergi's declaration, state that the job duties of loan originators included "coordinating with" various third parties "to ensure that each of the Originators' loans is processed, approved and closed in a timely manner." ECF 94-6, Ex. 2 at 3. Sergi likewise stated in his declaration that his job duties included (among other things) "ordering title services from a title company and coordinating with that title company to get the loan closed." *Id.* ¶ 3. At the same time, First Mariner's incentive plan stated that Sergi's performance of his duties was "subject to [First Mariner] direction and control," and that he performed his "duties for and on behalf of [First Mariner]," *id.*, Ex. 2 at 3. *See* Restatement, *supra*, §7.07(2) (scope of employment includes "performing work assigned by the employer or engaging in a course of conduct subject to the

employer's control"). Thus, a reasonable factfinder could conclude that Sergi was performing work assigned to him as a loan officer—namely, originating and closing mortgage loans—when he referred Plaintiffs' loans to Genuine Title in exchange for an illegal kickback.

Moreover, the record evidence is sufficient to allow a reasonable factfinder to conclude that Sergi's illegal referrals were made, at least in some in part, for First Mariner's benefit. *See Adams v. Hyannis Harborview, Inc.*, 838 F. Supp. 676, 691 (D. Mass. 1993), *aff'd sub nom.*, *Adams v. Zimmerman*, 73 F.3d 1164 (1st Cir. 1996) ("[T]he servant need not be acting for the 'exclusive benefit' of the principal, it is enough that the agent intended his acts to produce some benefit to himself and to the principal second." (quotation omitted)). While the evidence indicates that kickbacks were paid to Sergi personally, First Mariner nonetheless received a tangible benefit from the referral—namely, the performance of title services that were essential to closing the Plaintiffs' loans. This is true regardless of whether the closing services could have been provided by another title company. While Sergi's illegal referral agreement may have been *primarily* motivated by his own financial benefit, the relevant question is whether the referral was "intended by the employee to serve *any purpose* of the employer." Restatement, *supra*, § 7.07(2). Because a reasonable factfinder could conclude that the answer to that question is "yes," this Court cannot say, as a matter of law, that Sergi's actions were outside the scope of his employment. *See Quick v. Peoples Bank of Cullman Cty.*, 993 F.2d 793, 797 (11th Cir. 1993) (holding bank vicariously liable for loan officers' issuance of fraudulent loans, where the loan officer "had been assigned the function of making loans, and his activities did further that aspect of the Bank's business"); *Adams*, 838 F. Supp. at 691 (bank director acted within the scope of employment when he sold unregistered securities to plaintiff because the bank director's job duties included bringing in business to the bank). Defendant is not entitled to summary judgment on this issue.

### ii. Standing

Defendant next argues that Plaintiffs lack Article III standing because they have not introduced competent evidence establishing that they suffered a concrete injury. *See Planmatics, Inc. v. Showers*, 137 F. Supp. 2d 616, 620 (D. Md. 2001) ("On a motion for summary judgment, a district court may only consider evidence that would be admissible at trial." (citations omitted)). Standing is a doctrine rooted in the traditional understanding of an Article III "case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The burden is on the plaintiff to establish these elements. *Id*. To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 339 (quoting *Lujan*, 504 U.S. at 560). Importantly, "a plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (quoting *Lujan*, 504 U.S. at 561). "In response to a summary judgment request, the named plaintiff [in a class action] is obliged to 'set forth by affidavit or other evidence specific facts' that, when taken as true, establish each element of Article III standing." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quoting *Lujan*, 504 U.S. at 561).

Since *Spokeo*, it is clear that plaintiffs may not satisfy the strictures of Article III by alleging "a bare procedural violation." 578 U.S. at 341. Rather, plaintiffs must have suffered a concrete harm as a result of the "defendant's statutory violation that is the type of harm Congress sought to prevent when it enacted the statute." *Baehr*, 953 F.3d at 253 (quoting *Curtis v. Propel Prop. Tax*

*Funding, LLC*, 915 F.3d 234, 240-41 (4th Cir. 2019)). The Fourth Circuit has explained that under RESPA, "the deprivation of impartial and fair competition between settlement services providers" is not the kind of harm Congress sought to prevent and, thus, will not confer Article III standing. *Id*. at 254. Rather, "the harm it sought to prevent is the increased costs . . . for settlement services." *Id*. (holding that deprivation of fair competition "untethered from any evidence that the deprivation increased settlement costs—is not a concrete injury under RESPA"); *see also Edmondson v. Eagle Nat'l Bank*, Civil No. SAG-16-3938, 2020 WL 3128955, at *3 (D. Md. June 12, 2020).

Thus, to survive Defendant's motion for summary judgment, Plaintiffs must point to competent evidence showing they were charged higher costs for their respective title services as a result of the kickbacks paid to Sergi. Plaintiffs' briefing makes clear that they seek to rely to a significant degree on data compiled by Wells Fargo Bank, N.A. ("Wells Fargo"), reflecting the 80th percentile of title costs for every loan closed and funded by Wells Fargo's retail lending unit in 2009. ECF 101-24 at 80:13-84:19. Specifically, Plaintiffs seek to submit as evidence a chart reflecting these 80th percentile amounts for each state. *See* ECF 99-45 (hereinafter "the 80th Percentile Chart" or "the Chart"). The Chart was distributed to Wells Fargo's retail loan processing employees in March 2010 for use as a reference when analyzing title costs for certain types of loans. *Id*.; ECF 101-24 at 139:4-12, 151:5-10. Another version of the Chart using updated data was distributed internally by Wells Fargo in 2013. ECF 102-2 at 90:7-11. If the title charges on a Wells Fargo retail loan exceeded the 80th percentile amount for the state where the loan was issued, this signaled to Wells Fargo employees that the cost of the title services was unreasonable. *Id*. at 153:1-14. Plaintiffs claim the 80th Percentile Chart provides an "objective measure" of the customary and reasonable costs of title services throughout the relevant period. ECF 97-1 at 40. According to the Chart, the 80th percentile cost for title exam, search, and abstract fees for Wells

Fargo's retail refinance loans issued in Maryland in 2009 was $497. ECF 99-45 at 2. By comparison, Plaintiffs Bezek and Harris paid $910 and $1,200, respectively, in title exam and abstract fees. ECF 94-3 at 3; ECF 94-5 at 3.

Initially, Defendant asserts that Plaintiffs have abandoned any argument that they suffered a concrete injury, because they did not address the issue in their opposition to Defendant's summary judgment motion. *See* ECF 102 at 15; *Johnson v. United States*, 861 F. Supp. 2d 629, 634 (D. Md. 2012) ("Because the [plaintiffs] . . . failed to address the issue in any way in opposing summary judgment, they abandoned this argument."). This Court disagrees. In their opposition, Plaintiffs directly reference the 80th Percentile Chart as a basis for establishing their injury in fact. Specifically, Plaintiff's opposition states that "[t]he title and settlement service charges on both Class Representatives['] loans also exceed [the 80th percentile] benchmark by several multiples and are not 'reasonable and customary.'" ECF 97-1 at 40. While this point was interspersed within Plaintiffs' broader analysis of the class members' injuries and could have been highlighted more prominently, Plaintiff certainly did not "fail[] to address the issue" so as to constitute abandonment. *Johnson*, 861 F. Supp. 2d at 634.

Defendant next argues that the 80th Percentile Chart is not admissible because it is not probative of whether Genuine Title overcharged Plaintiffs as a result of the kickbacks paid to Sergi. ECF 102 at 16-18; ECF 112 at 5-6. Under the Federal Rules of Evidence, all "relevant" evidence is admissible unless otherwise provided for by the United States Constitution, an Act of Congress, or another applicable rule. Fed. R. Evid. 402; *United States v. Abel*, 469 U.S. 45, 51 (1984). Evidence is relevant if it "has any tendency to make . . . more or less probable" a "fact [that] is of consequence in determining the action." Fed. R. Evid. 401. Defendant contends the Chart is not relevant in this case because: (i) it only reflects data from loans funded and closed by Wells Fargo,

not First Mariner or any other bank; (ii) its sample loan population was limited to retail loans only; (iii) Wells Fargo was unable to disclose various details regarding the data sample, including the number of loans in the sample and how many different Maryland counties were represented; and (iv) the sample only included loans from 2009, whereas Plaintiffs' loans closed in 2010 and 2012, respectively. ECF 102 at 16. While these points are certainly pertinent to how much weight a factfinder may eventually give the Chart, they fail to show that the Chart is not relevant under the expansive definition of Rule 401. To the contrary, the statistical measures in the Chart make it more probable that Plaintiffs were overcharged (perhaps significantly so) for their title services. ECF 94-3 at 3; ECF 94-5 at 2; ECF 99-45 at 2. Thus, the Chart satisfies the low bar for relevancy set by Rule 401.

Defendant also contends that the Chart is inadmissible because it fails to satisfy Federal Rule of Evidence 1006 and, alternatively, is hearsay not subject to any exception. Plaintiffs respond that the Chart is a business record admissible under Federal Rule of Evidence 803(6).

This Court first agrees with Plaintiffs that Rule 1006 is inapplicable. That rule requires that a party seeking to use a "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court . . . must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. Defendant contends that Plaintiffs fail to satisfy this rule because they cannot make the 80th Percentile Chart's underlying source data—which Wells Fargo no longer has access to, ECF 102-2 at 91:11-21, 92:16-20—available for copying or examination. However, Rule 1006 applies to summary charts which are submitted "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence." *United States v. Simmons*, 11 F.4th 239, 262 (4th Cir. 2021) (quotation omitted). This may occur, for

example, when a party itself seeks to create and introduce a chart summarizing voluminous business records excepted from the hearsay rule. *See United States v. Laguerre*, 119 Fed. App'x 458, 460-61 (4th Cir. 2005) (applying Rule 1006 to such a scenario). Here, however, the 80th Percentile Chart is the actual business record at issue. It was created by Wells Fargo—not Plaintiffs—and used by Wells Fargo's retail loan employees as a reference for analyzing the reasonableness of title costs. Several courts have concluded that such "summary" business records offered pursuant to Rule 803(6) are not subject to the requirements of Rule 1006. *See, e.g.*, *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1045-46 (9th Cir. 2009) (declining to apply Rule 1006 to computer-generated summaries of insurance claim payments, where "the summaries *themselves* constituted the business records" and were not merely "summaries of other evidence"); *Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*, No. 5:19-CV-00021, 2022 WL 193742, at *9 (W.D. Va. Jan. 21, 2022) (finding Rule 1006 "inapplicable" where the balance spreadsheets offered "are the actual business records" and were "not stand-ins for underlying records that must otherwise be admissible"); *Taboas v. Fiddler, Gonzalez & Rodriguez, PSC*, 39 F. Supp. 3d 188, 193-94 (D.P.R. 2014) ("Because the charts are productivity reports offered as independent business records produced and kept within the ordinary course of [Defendant's] business and admissible under Federal Rule of Evidence 803(6), the charts are the writings at issue, not summaries of other evidence." (cleaned up)); *see also* 6 Weinstein's Federal Evidence § 1006.08 (2021) ("Rule 1006 does not apply when the summaries themselves constitute the business records."). This Court agrees with these authorities and concludes that Rule 803(6)—and not Rule 1006—governs the Chart's admissibility.

That leaves the question of whether the 80th Percentile Chart satisfies the requirements of Rule 803(6). The business records exception applies if: "(A) the record was made at or near the

time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness . . . ; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). Defendant argues that Plaintiffs cannot satisfy sections (C) and (E)—that is, the 80th Percentile Chart was not made regularly by Wells Fargo and lacks sufficient indicia of trustworthiness.

With respect to regularity, Defendant points to testimony by Wells Fargo's deponent indicating that the bank only made two versions of the 80th Percentile Chart during the period relevant to this litigation: once in 2010 (using 2009 data) and again in 2013 (using 2012 data). The charts were not otherwise revised in the interim. According to Defendant, two updates in three years is insufficient to show that creating the charts was a regular practice of Wells Fargo. *See Gen. Ins. Co. of Am. v. U.S. Fire Ins. Co.*, 886 F.3d 346, 358 (4th Cir. 2018) ("A qualified witness must be able to testify that the record was 'kept in the course of a regularly conducted business activity *and also* that it was a regular practice of that business activity to make the record.'" (emphasis added) (quoting *United States v. Komasa*, 767 F.3d 151, 156 (2d Cir. 2014)). However, the 80th Percentile Chart was certainly *used* by Wells Fargo loan employees regularly throughout the relevant time period. In fact, Wells Fargo's deponent testified that it became part of the bank's standard procedure to reference the title costs for certain loans against the 80th percentile data. ECF 112-1 at 139:11-12. Furthermore, the integration of the 80th percentile data as part of Wells Fargo's retail loan process "was never revoked" after 2010, and the measure was used consistently by bank employees throughout the relevant time period. *Id*. at 147:16-17, 151:16-21, 219:1-3. Under the

circumstances, this Court is satisfied that the consistent use of the 80th Percentile Chart by Wells Fargo employees, and those employees' ongoing reliance on its data throughout the relevant time period, is sufficient to satisfy the regularity requirement in Rule 803(6)(C). *See United States v. Reese*, 666 F.3d 1007, 1017 (7th Cir. 2012) (excluding evidence under Rule 803(6)(C) where "[t]here was no adequate showing that it was a regular practice to make this sort of record, *to maintain it, or to rely upon it*." (emphasis added)).[7]

Additionally, Defendant has failed to show that "the source of information or the method or circumstances of preparation [of the 80th Percentile Chart] indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). Defendant once again emphasizes the uncertain scope of the data sample used to create the Chart, concluding that, without the ability to examine the underlying data set, the Chart "is simply not reliable." ECF 112 at 5. But the Chart was relied upon consistently by Wells Fargo employees, who referenced it throughout the relevant time period as an objective measure for determining when title costs for certain types of loans were too high. Once again, Defendant's objections are best directed to the weight that a factfinder may ultimately give to the 80th Percentile Chart, not whether the numbers in the Chart are a trustworthy reflection of the cost of title services paid on Wells Fargo-funded retail loans. *See, e.g.*, *United States v. Wein*, 521 F. App'x 138, 140 (4th Cir. 2013) (concluding that the defendant's claim the lack of testimony regarding the accuracy or completeness of comments entered by customer service representatives

---

[7] One widely respected evidence treatise has counseled that "Rule 803(6) should be interpreted so that the absence of routineness does not result in exclusion of the record when all other requirements of the rule are satisfied unless 'the source of information' or 'the method or circumstances of preparation' indicate 'a lack of trustworthiness.'" 1 Weinstein's Evidence Manual § 16.07 (2022). As discussed below, this Court concludes that neither the source of the 80th percentile amounts nor the method of their calculation indicates a lack of trustworthiness.

during phone calls "does not affect the admissibility of the records [under Rule 803(6)] and is directed to the weight of the evidence").

Finally, Defendants contend that that the Chart is inadmissible because the information purportedly reflected therein is itself hearsay. ECF 112 at 4-5. "Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person." *United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006) (cleaned up), *cert. denied*, 550 U.S. 927 (2007). In such cases, "[a]ny information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible." *Id.*; *see also* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded . . . if each part of the combined statements conforms with an exception to the rule."). In this case, Wells Fargo created the Chart using data from HUD-1 forms prepared by the title companies that provided services for each loan. Defendants accordingly argue that because Plaintiffs have not shown that data listed on the HUD-1 forms falls within a hearsay exception, the Charts must be excluded. However, when a custodian incorporates records created by a third-party into their own business records and relies on those records in conducting their business, "[s]uch evidence may properly be considered by the Court under the business records exception." *Bey v. Midland Credit Mgmt., Inc.*, No. GJH-15-1329, 2016 WL 1226648, at *5 (D. Md. Mar. 23, 2016) (citing *Brawner v. Allstate Indem. Co.*, 591 F.3d 984. 987 (8th Cir. 2010); *United States v. Adefehinti*, 510 F.3d 319. 326 (D.C. Cir. 2007)). In this case, Wells Fargo's deponent testified that the bank took HUD-1s for all of its funded loans into custody. ECF 112-1 at 127:7-17. Indeed, federal law required Wells Fargo to retain each HUD-1 form for five years after settlement. 12 C.F.R. §1024.10(e). Finally, Wells Fargo relied on the HUD-1 forms and the data included in them to run its business—including, in this case, to determine when certain borrowers were being overcharged for title

services. ECF 112-1 at 139.8-140:7. Because the HUD-1 forms are themselves business records that were incorporated into Wells Fargo's records and relied upon by the Bank, they may be considered. The 80th Percentile Chart based on the data from those HUD-1 forms is also therefore admissible.

In short, the Chart is relevant evidence and is an admissible business record pursuant to Rule 803(6). Of course, it will be up to a factfinder to ultimately determine how much weight to afford the Chart—alongside any other evidence Plaintiffs seek to rely on, *see, e.g.*, ECF 97 at 37-41—in determining whether Plaintiffs were overcharged for their title services as a result of Sergi's kickback arrangement. For the purposes of summary judgment, however, Plaintiffs have "'set forth by affidavit or other evidence specific facts' that, when taken as true, establish" an injury-in-fact sufficient to support Article III standing. *Baehr*, 953 F.3d at 253 (citing *Lujan*, 504 U.S. at 561).

### 2.  Class Issues

Defendant and Plaintiffs have both moved for summary judgment on issues regarding the First Mariner Class claims. Defendant seeks summary judgment on the claims of 54 class members, arguing that Plaintiffs have not shown any evidence of a RESPA violation with respect to those members' claims. ECF 94-1 at 22-24; ECF 102 at 18-23. Plaintiffs, in turn, have cross-moved for summary judgment cementing the 276 loans that comprise the First Mariner class.

### i.  *Class Membership*

Though not chronological, the Court will first address Plaintiff's cross-motion for summary judgment with respect to class membership. In their motion for class certification, Plaintiffs identified 330 First Mariner loans that potentially fell within the First Mariner Class definition: this is, individuals that (1) received federally related loans brokered by First Mariner during the relevant time period, and (2) received settlement services from Genuine Title. *See* ECF 34-8, ECF

34-9. Having now reviewed the HUD-1 settlement statements for these transactions during discovery, Plaintiff claims it is "able to identify with certainty" 276 loans which meet the First Mariner Class definition. ECF 97-1 at 17. Plaintiffs thus move for summary judgment identifying the 276 transactions that comprise the First Mariner Class and excluding those loans that do not meet the class definition. Defendant opposes summary judgment on this issue because, in its view, Plaintiffs' motion does not seek a "judgment" within the meaning of Rule 56.

Rule 56(a) permits a party to "move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a). Plaintiffs' motion on this issue, however, does not describe a "claim" or "defense" (or part thereof) related to the RESPA violations alleged in this action. Instead, Plaintiffs seek a factual ruling from this Court that a specific number of prospective class members satisfy the class definition in this Court's certification Order. ECF 48 at 2. This is not an appropriate use of Rule 56(a). Furthermore, any attempt by Plaintiffs to rely on Rule 56(g) is also misplaced. Rule 56(g) allows a party to seek an order "stating any material fact . . . that is not genuinely in dispute and treating that fact as established in the case." Fed. R. Civ. P. 56(g). But Rule 56(g) relief is only available "if the court does not grant all the relief requested by the motion" under Rule 56(a). Fed. R. Civ. P. 56(g). In other words, Rule 56(g) is inapplicable unless a party makes a proper Rule 56(a) motion. *See Steeped, Inc. v. Nuzee, Inc.*, Case No. 19-cv-03763-HSG, 2020 WL 6891832, *2 (N.D. Cal. Nov. 24, 2020) (stating that Rule 56(g) "becomes relevant only after the court has applied the summary-judgment standard . . . to each claim, defense, or part of a claim or defense, identified by the motion"); *U.S. Equal Emp. Opportunity Comm'n v. CACI Secured Transformations, LLC*, No. CV JKB-19-2693, 2021 WL 1840807, at *14 (D. Md. May 7, 2021)

("A court can deny a motion seeking to establish only facts as an improper Rule 56(g) motion, even if it is styled as a 56(a) motion.").

Furthermore, and as a practical matter, this Court concludes that issuing a judgment on the scope of the First Mariner Class is unnecessary at this stage. The parties do not dispute that the loans of 276 individuals meet the class definition in the Court's certification order. As for loans that the parties agree do not meet the class definition, they are no longer part of the instant action and will not be bound by any adjudication thereof.[8] While this Court must ultimately make a finding of the class membership to be bound by any judgment in this case, this determination will rely on a variety of factors, including whether adequate notice was provided or whether any individuals requested exclusion from the class. *See* Fed. R. Civ. P. 23(c)(3)(B). This Court therefore declines to delineate the specific scope of the First Mariner Class at this stage of the litigation.

### ii.   Lack of Evidence

Defendant seeks summary judgment as to the claims of 54 First Mariner Class members, arguing that Plaintiffs have failed to introduce evidence that the First Mariner loan officers who originated those loans received any kickback from Genuine Title. Essentially, Defendant argues that Plaintiffs' have only generated proof of a kickback on loans directly attributable to eight First Mariner employees: Sergi, Restivo, Alston, Iobbi, Buchanan, Bowen, Cohen, and Pobletts. For all other loans in the First Mariner Class, Defendant claims it is entitled to summary judgment. For the reasons discussed below, this Court agrees that Defendant is entitled to summary judgment on some—but not all—of the 54 loans at issue.

---

[8] This Court thus agrees with Plaintiffs that Defendant is not entitled to summary judgment on any non-class claims, to the extent its motion may be interpreted as seeking such relief. *See* ECF 94-1 at 22-24; 97-1 at 18-19.

First, Defendant contends that Plaintiffs have failed to introduce evidence that certain loans originated from First Mariner's White Marsh branch were subject to Genuine Title's kickback arrangement with Pobletts. As discussed above, Zukerberg stated in his affidavit that Genuine Title had a cash kickback arrangement with Pobletts and that all loans referred to Genuine Title by Pobletts were labeled "1st Mariner – Theresa Frederick's Branch." ECF 94-16 ¶¶ 4-7. Defendant thus acknowledges that Zukerberg's affidavit provides sufficient evidence at this stage with respect to the 67 First Mariner Class loans for which Pobletts is listed as the client contact or that are labeled "1st Mariner – Theresa Frederick's Branch." The parties dispute, however, whether this evidence suffices to overcome summary judgment for other class loans from the White Marsh branch that are not otherwise directly attributed to Pobletts. Plaintiffs claim that Pobletts was a "branch manager," and therefore Zukerberg's testimony alone constitutes evidence that "Genuine Title paid a kickback on each First Mariner loan assigned and referred from" the White Marsh branch. ECF 97-1 at 24. As Defendant correctly points out, Zukerberg's affidavit referred to Pobletts as a "loan officer," not a branch manager. ECF 94-16 ¶ 4. However, Defendant acknowledges in its reply that it believes "Pobletts was, at some point, a branch manager at its White Marsh branch." ECF 102 at 19 n.13. Indeed, one exhibit includes an email from Pobletts sent on December 16, 2013, in which her signature block lists her as a branch manager in White Marsh. ECF 101-16 at 2. Furthermore, Zukerberg's testimony states that a referral fee was paid to Pobletts "for all 1st Mariner borrowers' loans assigned and referred by *them* that closed with Genuine Title in 2012 and 2013." ECF 94-16 at ¶ 8. Viewing the evidence in the light most favorable to Plaintiffs, there is a genuine dispute as to whether Pobletts received a kickback in connection with all the loans referred from the White Marsh branch to Genuine Title in 2012 and

2013. Defendants are not entitled to summary judgment with respect to the disputed White Marsh claims.

Second, the parties dispute whether Plaintiffs have introduced evidence of a kickback arrangement regarding loans originated by First Mariner employees Tammi Lewis, Daniel Gough, and Tracie Duerr. Plaintiffs argue these loans are attributable to Sergi's kickback arrangement, pointing to (1) a statement from Glickstein's declaration that Sergi received a kickback from "each loan that Sergei's [sic] *group* assigned and referred," ECF 99-24 ¶ 8(a), and (2) emails and loan documents indicating that Lewis, Gough, and Duerr each worked at the Ellicott City branch where Sergi was employed, *see* ECF 101-17. However, in Sergi's declaration obtained by Plaintiffs, he identified himself as a "loan officer." ECF 99-20 ¶ 1. He also stated in a later declaration that he was not a group leader, was not part of any group during his time at First Mariner, and worked exclusively as a loan officer except for a brief period in 2014 when he was a sales manager.[9] ECF 99-21 ¶¶ 2, 3. More importantly, the fact that Lewis, Gough, and Duerr worked at one of the branches where Sergi was employed as a loan officer is insufficient, on its own, to create a genuine dispute as to whether they referred loans in collaboration with Sergi or as part of his "group." The cited documents in no way indicate that Lewis, Gough, and Duerr worked with Sergi on specific loans or were otherwise subject to his control. *See* ECF 101-17. Thus, Plaintiffs have failed to introduced evidence linking loans originated by Lewis, Gough, and Duerr to Sergi's kickback arrangement with Genuine Title, and Defendant is entitled to summary judgment on the corresponding class member claims.

---

[9] Each of the loans that Lewis, Gough, and Duerr were responsible for closed in 2012 or earlier, before Sergi became a sales manager.

Third, the parties contest whether several loans originated by First Mariner employees Robert Gullace, Chris Perrin, Robert Hoover, and Ken Miller are attributable to Bowen. In his April 28, 2022 declaration, Glickstein stated that "[t]here was a Referral Agreement related to Tom Bowen[,] a loan officer, branch manager and sales manager employed by First Mariner[,]" and further that Bowen was paid a $100-$200 marketing credit "[f]or each loan that a loan officer in [his] group out of First Mariner's Bel Air branch, or Tom Bowen, assigned and referred to Genuine Title." ECF 94-18 ¶ 8(a). Plaintiffs have pointed to First Mariner documents which indicate that Bowen was the sales manager for Gullace, Perrin, Hoover, and Miller. ECF 101-14 at 4, 6. Furthermore, Plaintiffs have introduced an email exchange between Glickstein and Bowen, in which Glickstein asks for "a roster of all the [loan officers] within your office that will be sending orders our way" so that Glickstein can "make sure they are properly on boarded." ECF 99-26 at 2. Bowen responds by sending Glickstein the names of Gullace, Perrin, Hoover, and Miller. *Id*. Taken together, Plaintiffs' evidence is sufficient to create a genuine dispute as to whether the loans sent to Genuine Title by these four individuals were also part of Bowen's kickback arrangement. Therefore, Defendants are not entitled to summary judgment on these  claims.

Fourth, Defendants seek summary judgment with respect to several class member loans originated by Ryan Lowry. In opposition, Plaintiffs point to bank documents which purportedly show that Lowry was the sales manager at First Mariner's White Marsh Branch and the branch manager at First Mariner Bel Air Branch where Bowen and Restivo were housed. *See* ECF 101-14 at 3, 5. Plaintiffs also rely on Restivo's declaration that "[t]he branch manager at My Branches knew the Genuine Title business model of using a Referral Agreement to obtain business. As such, I believe that he knew that myself and others were being compensated for the referral of 1st Mariner

borrowers to Genuine Title." ECF 99-18 ¶ 12. Even assuming the veracity of this statement,[10] it establishes only that Lowry may have known that Restivo and others were receiving kickbacks for referrals to Genuine Title—not that Lowry himself received any such kickbacks. Thus, Plaintiffs have pointed to no evidence that such an agreement was in place with respect to the class member loans originated by Lowry. Defendant is therefore entitled to summary judgment on those class member claims.

Fifth, Defendants challenge the evidentiary basis for a collection of First Mariner Class claims which were originated by employees of First Mariner's Eldersburg, Maryland branch. To support these claims, Plaintiffs rely primarily on Glickstein's April 28, 2022 declaration, in which he identifies 15 loans originated by employees of the Eldersburg branch[11] that were referred to Genuine Title through an intermediary named Brian Boateng. ECF 94-18 ¶ 9, ex. A. Glickstein's declaration further states that, "Based on my personal experience working with Brian Boateng, it is more likely so than not so that the referral of these loans . . . were pursuant to an agreement to provide a thing of value to First Mariner bank in exchange for the referral of loans to Genuine Title." ECF 94-18 ¶ 9. Defendant claims it does not know who Brian Boateng is, and further that Glickstein's statement fails to satisfy the requirement under Federal Rule of Civil Procedure 56(c)(4) that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge." However, Glickstein's declaration states that he worked with Boateng "in

---

[10] Notably, in a subsequent declaration, Restivo stated that his sales manager—not his branch manager—was aware that he was receiving marketing credits in exchange for Genuine Title referrals. ECF 99-18 ¶ 11. Restivo added that he "[did] not know whether my branch manager was aware" of the arrangement, and further stated that he had "no personal knowledge of whether my branch manager knew of others at [First Mariner] receiving any kickback, fee, or anything else of value for loan referrals to Genuine Title." *Id.*

[11] Though Glickstein's declaration does not refer to the Eldersburg branch, other evidence indicates that that First Mariner employees listed for each loan worked out of that branch. *See* ECF 94-18 at ex. A; ECF 101-13.

connection with several lenders" and it is based on this "personal experience" that he concludes that it is likely that the 15 Eldersburg branch loans identified in the declaration were the product of a kickback arrangement. This portion of the declaration therefore satisfies Rule 56(c)(4)'s "personal knowledge" requirement and is sufficient to create a triable issue of fact regarding whether the Eldersburg loans were referred subject to an illegal kickback arrangement. Ultimately, it will be up to a jury to weigh Glickstein's testimony at trial on this point, along with any other evidence Plaintiffs may present.

Finally, Plaintiffs oppose summary judgment with respect to several loans attributed to First Mariner employees Mark McNicholas, Anne Niederberger, and Denise DeCarolis on the grounds that these individuals worked in the same branch or the same group as Iobbi, Buchanan, or Alton. Once again, however, the fact that these individuals worked at the same branch as other First Mariner employees who admitted to, or have been accused of, receiving kickbacks from Genuine Title is insufficient, without more, to create a genuine dispute as to whether they also participated in such a referral arrangement. *See supra* at 26. Defendant is entitled to summary judgment with respect to these particular class claims.

In sum, this Court will grant summary judgment to Defendant on certain of the First Mariner Class claims, in accordance with the analysis above. However, summary judgment will be denied on the remainder of the disputed class claims, including those relating to the White Marsh and Eldersburg branches.

### 3. Method of Calculating Damages

Defendant next seeks summary judgment on the method of calculating damages for a RESPA violation. The amount of damages a successful RESPA plaintiff is entitled to is governed by  12 U.S.C. § 2607(d)(2), which states:

> Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

Defendant argues that Plaintiffs' RESPA damages are limited to three times the amount that each borrower was overcharged for title and settlement services as a result of the alleged kickbacks. Plaintiffs, on the other hand, argue that the plain language of the statute entitles them to treble the amount of *all* settlement services charged by Genuine Title, regardless of whether a specific charge was actually increased as a result of the kickback.

As the parties acknowledge, there is a split in authority regarding what amount of damages should be trebled under § 2607(d)(2). Plaintiffs rely largely on analysis from a previous case in this Court, *Robinson v. Fountainhead Title Grp. Corp.*, 447 F. Supp. 2d 478 (D. Md. 2006). There, the Court held that a RESPA plaintiff had adequately alleged in her complaint that she suffered an overcharge as a result of a kickback and therefore had standing to bring her RESPA claim. *Id*. at 488. Alternatively, however, the Court concluded that such an overcharge was not necessary to establish standing. *Id*. at 488-89. In reaching this latter conclusion, *Robinson* endorsed the reasoning of another district court, *Kahrer v. Ameriquest Mortgage Co.*, 418 F. Supp. 2d 748 (W.D. Pa. 2005), which concluded that the seemingly expansive language of RESPA's damages provision—providing for recovery of three times the amount of *any* charge paid for settlement services, as opposed to merely the amount of an overcharge—strongly indicated that allegations of an overcharge were not necessary to show an injury-in-fact under the statute. *Id*. Ultimately, *Robinson* agreed with *Kahrer* that the damages provided under RESPA "appear to encompass all of the charges associated with the services provided rather than only treble the amount of any overpayment." *Id*. at 488 (quoting *Kahrer*, 418 F. Supp. 2d at 753).

Importantly, however, *Robinson* preceded *Baehr*. There, the Fourth Circuit, relying on the Supreme Court's decision in *Spokeo*, expressly held that a RESPA plaintiff must allege and prove an overcharge in order to have standing to recover monetary damages. *Baehr*, 953 F.3d at 254-56 ("Congress specified in RESPA that by prohibiting kickbacks, the harm it sought to prevent is the increased costs that 'tend' to result from kickbacks' interference with the market for settlement services."). The Fourth Circuit rejected the plaintiffs attempted reliance on *Robinson*, reasoning that *Robinson* was "pre-*Spokeo*" and, further, that the plaintiffs in *Robinson* had in fact alleged injuries due to overcharges. *Id.* at 255. Thus, to the extent that *Robinson* held that a RESPA plaintiff need not allege an overcharge to have standing, that holding has been overruled by *Baehr*. *Robinson*'s brief discussion of RESPA's damages provision as part of its now-repudiated standing analysis is of little persuasive value here.

Ultimately, this Court agrees with Defendant that the best reading of § 2607(d)(2) is that a damages award for a RESPA violation consists of three times the amount of the overcharge. "When interpreting a statute, we begin with the plain language." *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013). Here, the statute provides for damages "in an amount equal to three times the amount of any charge paid for *such* settlement service." § 2607(d)(2) (emphasis added). "Such" in this case refers back to "the settlement services *involved in the violation*." *Id.* (emphasis added). Plaintiffs, however, seek to treble the amount paid for all of their settlement services, regardless of whether any of those charges were actually increased by an illegal kickback. This includes charges for title insurance premiums, even though title insurance rates are set by regulation in Maryland and the charges to a borrower cannot be altered by the title company. *See* Md. Code. Ann., Ins., §§ 11-403(a)(1), (c); 11-407(b). This Court joins the numerous others who have rejected Plaintiffs' proposed reading of § 2607(d)(2). *See Durr v. Intercounty Title Ins. Co.*

*of Ill.*, 14 F.3d 1183 (7th Cir.1994) (rejecting a demand for trebled damages on all settlement services under RESPA); *Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1427 (S.D. Fla. 1997) ("[A] better reading of the statute is that the damage award consist of three times the amount which violates RESPA."); *Moore v. Radian Group, Inc.*, 233 F. Supp. 2d 819, 826 (E.D. Texas 2002); *Mullinax v. Radian Guar., Inc.*, 311 F. Supp. 2d 474, 486 (M.D.N.C. 2004).

Defendant's interpretation of § 2607(d)(2) is also consistent with RESPA's purpose. Specifically, Congress passed RESPA to protect consumers from "unnecessarily high settlement charges caused by certain abusive practices" through "the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601; *see also Baehr*, 953 F.3d at 254. It is difficult to see how RESPA's goal of preventing increased settlement charges is served by allowing a defendant to collect damages for charges, such as insurance premiums, that are not in any way increased by an alleged kickback. Moreover, such an approach is arguably at odds with *Baehr*, which specified that the injury-in-fact that gives a plaintiff standing to bring a RESPA claim is the increased costs—i.e., the overcharge—that result from an illegal kickback. *Baehr*, 953 F.3d at 254-56.[12] Under Plaintiffs' proposed reading, the

---

[12] For this reason, Plaintiffs' reliance on *Kahrer*, which explicitly rejected the reasoning of *Durr*, *Morales*, and *Moore*, is misplaced. *Kahrer*, like the other cases discussed above, was ultimately a case about standing. Specifically, the district court concluded that the language of § 2607(a) allowed a plaintiff to collect damages beyond any actual overcharge, and therefore a plaintiff did not need to allege an overcharge to show standing. *Kahrer*, 418 F. Supp. at 751-56. But *Kahrer*'s standing holding is not compatible with binding Fourth Circuit case law stating that the "injury" which Congress sought to address with RESPA is the increased costs resulting from kickbacks. *See Baehr*, 953 F.3d at 254-56. Moreover, *Kahrer*'s analysis implicitly acknowledges that standing and damages are intertwined. *See TransUnion*, 141 S.Ct. at 2208 ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."). Essentially, Plaintiffs ask for a damages remedy that is divorced from the injury that gives them standing to bring their RESPA claims. This Court concludes that the better reading of § 2607(d)(2) is the one that harmonizes RESPA's remedial structure with the standing requirements of Article III.

amount of damages available to a RESPA plaintiff would be determined completely by the amount paid for title services (with larger loans subject to higher title insurance premiums and, by extension, greater damages), regardless of the amount of any actual overcharge. This Court rejects such an approach, and instead agrees that "[t]ying (and trebling) the recoverable damages to that portion of the charge for the settlement service 'involved in the violation' advances the purposes of RESPA while respecting Article III's command that a private plaintiff must suffer an actual injury before invoking the jurisdiction of a United States District Court." *Moore*, 233 F. Supp. 2d at 825.

In sum, this Court agrees with Defendant that pursuant to § 2607(d)(2), the damages Plaintiffs may seek are treble the amount (if any) that they were overcharged by Genuine Title as a result of the alleged illegal kickbacks. Defendant is entitled to summary judgment on this issue.

### 4. Successor Liability

Plaintiffs seek summary judgment establishing Defendant's successor liability for Plaintiffs' claims against First Mariner. In opposition, Defendant does not attempt to argue that it did not expressly assume First Mariner's RESPA liability when it merged with First Mariner's successor in interest, Howard Bank. Rather, Defendant merely contends that "[s]uccessor liability is not an independent cause of action," and that any grant of summary judgment on this issue, prior to determining First Mariner's underlying liability, would be "premature." ECF 102 at 33-34.

Defendant's arguments misapprehend Rule 56. As discussed above, Rule 56(a) expressly permits a party to seek summary judgment on any "claim or defense – or the part of each claim or defense . . . ." Fed. R. Civ. P. 56(a); *see also CACI Secured Transformations*, 2021 WL 1840807, at *14 (noting that Rule 56 "contemplates the possibility that summary judgment may be entered on less than a full claim and on one or fewer than all of the elements necessary to establish a claim"

(quotation omitted)). In contrast to Plaintiffs' request for judgment on whether the 276 First Mariner Class members satisfy the class definition, *see supra* at 22-24, Defendant's successor liability is an essential aspect of the legal claims made by Plaintiffs and the Class, *see* ECF 81 ¶¶ 7, 120, as well as a potential defense. Furthermore, Plaintiffs' request for summary judgment is based on the undisputed content of two merger agreements, and therefore presents a purely legal issue. Defendant has not challenged the relevant terms in the merger agreements or argued that their terms are susceptible to more than one meaning. Accordingly, Plaintiffs' request for summary judgment on the issue of successor liability is proper under Rule 56(a).

Furthermore, this Court agrees with Plaintiff that, under the terms of the merger agreements, Defendant expressly assumed liability for First Mariner's alleged violations of RESPA. Specifically, First Mariner's merger agreement with Howard Bank, which was entered into on August 14, 2017, included a clause stating that Howard Bank "shall succeed to and assume all the rights and obligations of First Mariner in accordance with" Maryland law. ECF 99-1, at ¶ 1.1. Maryland law provides that, in the event of a consolidation or merger, "[t]he successor is liable for all the debts and obligations of each nonsurviving corporation." Md. Code Ann., Corps. & Ass'ns § 3-114(f)(1); *see also Ramlall v. MobilePro Corp.*, 30 A.3d 1003, 36 (Md. Ct. Spec. App. 2011) ("In Maryland, the General Assembly has imposed the condition that when two corporations merge, the debts and obligations of the predecessor corporation become the debts and obligations of the successor corporation."). Similarly, Howard Bank's merger agreement with Defendant contained a clause stating that Defendant "shall be responsible for all the liabilities of every kind and description, of each of [Defendant] and Howard Bank existing immediately prior to"

completion of the merger. ECF 99-5, at ¶ 6.[13] The merger became effective on or about February 5, 2022. ECF 99-6, at 4; ECF 77, at ¶ 5. Thus, under the plain terms of the merger agreement, Defendant at that time expressly assumed "all the liabilities" of Howard Bank—including Howard Bank's liability for Plaintiffs' and the First Mariner Class's RESPA claims, which it assumed as part of its merger with First Mariner.

Plaintiffs are thus entitled to summary judgment on the issue of whether Defendant, as First Mariner's successor in interest, can be held liable for Plaintiffs' and the class's RESPA claims, should they ultimately be proven.

### C.  Motion to Decertify the First Mariner Class

In addition to seeking summary judgment on the issues discussed above, Defendant's motion asks this court to decertify the First Mariner Class. Specifically, Defendant asserts that "[c]ircumstances have changed significantly" since this Court certified the First Mariner Class in October, 2020, such that the class can no longer satisfy the requirements of Rule 23. ECF 94-1 at 29. As noted above, "an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate." *Minter*, 2013 WL 1795564 at *2 (quoting *Stott*, 916 F.2d at 139). At the same time, "decertification is a drastic step, not to be taken lightly." *Alig v. Quicken Loans Inc.*, No. 5:12-CV-114, 2017 WL 5054287, at *10 (N.D.W. Va. July 11, 2017) (quoting 3 Newberg on Class Actions § 7:37 (5th ed. 2013)). "Courts thus consistently hold that 'there must be some development or change in circumstances to merit revisiting a class certification decision.'" *Id.* (quoting *In re J.P. Morgan*

---

[13] The merger agreement between Howard Bank and Defendant was governed by Maryland and Pennsylvania law. ECF 99-4, at § 1.1, 1.3(a). Like Maryland, Pennsylvania law provides that all debts, obligations, and liabilities of a merging association are assumed by the surviving association. *See* 15 Pa.C.S. § 336(a)(4); *LTV Steel Co., Inc. v. Workers' Comp. Appeal Bd. (Mozena)*, 754 A.2d 666, 677 (Pa. 2013).

*Chase Cash Balance Litig.*, 255 F.R.D. 130, 133 (S.D. N.Y. 2009)); *Minter*, 2013 WL 1795564 at
*2.

### i.   *Adequacy of Representation and Overbreadth*

Initially, Defendant makes two preliminary arguments in favor of decertification, both of
which are unavailing. First, Defendant contends that the class lacks adequate representation
pursuant to Rule 23(a)(4) because Defendant is entitled to summary judgment on the named
Plaintiffs' claims. *See* 3 Newberg and Rubenstein on Class Actions § 7:38 (6th ed.) ("[I]f a class
lacks adequate representation, it is susceptible to decertification.") However, for the reasons
described above, this Court has already denied Defendant's summary judgment motion with
respect to Plaintiffs' claims. *See supra* at 9-22. Second, Defendant briefly argues that this Court
should decertify the class as impermissibly overbroad. ECF 94-1 at 30. But while Defendant
contends that no evidence of an illegal referral exists with respect to "dozens" of First Mariner
Class loans, this Court has already concluded that Defendant is only entitled to summary judgment
on a small portion of the disputed class member claims. For the remainder of the class claims,
which constitute the vast majority of the 276 loans that undisputedly satisfy the class definition,
Plaintiffs have introduced evidence sufficient to create a genuine dispute that the loans were
referred to Genuine Title pursuant to an illegal kickback scheme. Thus, the relative breadth of the
First Mariner Class provides no basis for decertification.

### ii.   *Predominance*

The primary basis of Defendant's decertification motion is that certification of the First
Mariner Class is no longer appropriate under Rule 23(b)(3). Once again, that rule requires the
Court to find "that the questions of law or fact common to class members predominate over any
questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). To satisfy predominance,

common questions must have a significant "bearing on the central issue in the litigation." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 366 (4th Cir. 2014). In other words, the requirement is met where all class members' claims "depend upon a common contention," and establishing "its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). As this Court stated in its Memorandum Opinion granting Plaintiffs' motion for class certification, "the essence of each proposed class member's claim against First Mariner is that First Mariner referred them to Genuine Title for settlement services because Genuine Title promised to, and actually did, provide cash or other kickbacks to First Mariner in accordance with a prior common agreement." ECF 47 at 10.

Defendant presents several arguments for why the requirements of Rule 23(b)(3) are no longer satisfied in this case, including that (1) RESPA liability cannot be established by common proof, (2) the allegedly illegal referrals are not typical class-wide, (3) individual issues regarding standing and RESPA damages predominate, and (4) individual questions regarding Defendant's statute of limitations defense predominate. For the reasons explained below, however, none of these assertions provides a basis for decertifying the First Mariner Class.

First, Defendant contends that discovery has failed to result in any evidence of a widespread or common kickback scheme between Genuine Title and First Mariner, and therefore RESPA liability cannot be established by common proof. In essence, Defendant insists that the evidence introduced is limited to the isolated conduct of "eight rogue employees," and therefore First Mariner's liability necessarily turns on individual inquiries into the conduct of those employees. ECF 94-1 at 31-32. As an initial matter, the number of employees involved in the purported kickback arrangement is disputed, and Plaintiffs have introduced evidence that Genuine Title's relationship with First Mariner extended beyond the eight "rogue employees" to other

individuals at multiple First Mariner branches. Moreover, as the Court observed when certifying the class, "[t]he nature of the alleged conduct of all the loan officers . . . is largely the same." ECF 47 at 12. Thus, the Court is not convinced that Defendant's vicarious liability for its employees' conduct will hinge on burdensome individual inquiries. Vicarious liability undoubtedly will, however, turn on common questions of whether those employees were acting within the scope of their employment when they allegedly referred loans to Genuine Title as part of a kickback arrangement. And Defendant has offered no reason to believe that any of the employees identified by Plaintiffs are uniquely situated, such that individual issues will predominate in any vicarious liability analysis.

Next, Defendant argues that determining whether First Mariner employees actually "referred" any class loan to Genuine Title in violation of RESPA will require "an inherently individualized analysis of the circumstances by which Genuine Title came to provide settlement services in connection with that particular loan." ECF 94-1 at 33. *See* 12 U.S.C. § 2607(a); *Fangman*, 2016 WL 6600509, at *12 (requiring a RESPA plaintiff to prove an "actual referral" of settlement business in exchange for a thing of value). This argument essentially repeats contentions raised and addressed at the certification stage, and Defendant identifies no changed circumstances that would merit decertification. *See Alig*, 2017 WL 5054287, at *10 ("A motion to decertify is not, however, to be treated as another bite at the apple in the absence of changed circumstances.") Furthermore, courts have broadly construed what constitutes a referral in the RESPA context, emphasizing that a referral "need not be the exclusive or even the primary reason that influenced a home buyer's choice of a real estate service provider." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1184 (9th Cir. 2015); *Palombaro v. Emery Fed. Credit Union*, No. 1:15-cv-792, 2017 WL 3437559, at *11-12 (S.D. Ohio Aug. 10, 2017) (finding common questions regarding whether

referrals occurred predominated even where a class member may have chosen Genuine Title prior to a referral). Given this broad definition and the evidence Plaintiffs have adduced of a common kickback scheme between Genuine Title and various First Mariner employees, this Court is convinced that class-wide questions on whether the class members were referred to Genuine Title predominate over any potential individual issues. Furthermore, Defendant's related contention that Plaintiffs' claims are not sufficiently typical under Rule 23(a)(3) because other class claims involve different loan officers or other forms of kickbacks has already been addressed by this Court at the certification stage and, in any event, is meritless. *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998) (explaining that class certification primarily requires the class representative to have the "same interest" and "same injury" as other class members); *Palombaro*, 2017 WL 3437559 at *7 (finding the typicality requirement met where proposed RESPA class members worked with different loan officers because "[d]ifferences in the form or amount of kickback are not relevant to whether [the defendant's] overall conduct, if otherwise uniform and proven, is culpable").

Additionally, Defendant makes two related assertions that individualized inquiries regarding class member standing and damages destroy predominance. With respect to standing, Defendant points to the Supreme Court's recent holding in *TransUnion* that "[e]very class member must have Article III standing in order to recover individual damages," 141 S.Ct. at 2208, and contends that Plaintiffs have failed to identify a "coherent way to prove, on a class-wide basis, that class members paid increased settlement costs because of purported kickbacks." ECF 94-1 at 36. However, as this Court recently noted in a related case, "the fact that Plaintiffs may have been overcharged by different amounts as a result of the kickbacks at issue neither destroys their standing nor the predominance of the common legal and factual issues related to their claims."

*Brasko v. Howard Bank*, No. 1:20-CV-3489-SAG, 2022 WL 951771, at *3 (D. Md. Mar. 29, 2022); *see also id.* ("Surely the Supreme Court did not hold in *TransUnion* that a class may not be certified if its members have suffered different amounts of monetary harm.") Of course, under *TransUnion*, Plaintiffs must ultimately prove that each class member has Article III standing. However, Plaintiffs have proposed evidence reflecting multiple, common measures by which to determine whether an individual class member was overcharged for title services, including the Wells Fargo's 80th Percentile Chart. *See* ECF 105-1 (reflecting evidence Plaintiffs' seek to rely on to establish standing for each class member). If Plaintiffs' arguments prevail, comparing these objective numbers against the title costs listed on the class members' HUD-1 forms should be a relatively streamlined endeavor, particularly given the manageable size of the First Mariner Class. Likewise, this Court is not convinced at this stage that the need to account for lender credits on certain loans is sufficient to overcome common questions in determining whether the class plaintiffs were indeed overcharged for title services.

For similar reasons, this Court disagrees with Defendant that the need for individualized damage assessments makes class treatment untenable. The Fourth Circuit has made clear that "Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification." *Gunnells*, 348 F.3d at 427-28. To the contrary, "Rule 23 explicitly envisions class actions with such individualized damage determinations." *Id.* at 428. While this Court's holding that RESPA damages are limited to the amount of any overcharge undoubtedly means that some individual analysis will be required to ascertain any damages, this fact alone is insufficient to decertify the First Mariner Class, where common issues continue to predominate regarding Defendant's liability for violations of RESPA. *See id.* ("If common questions predominate over individual questions as

to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied." (quotation omitted)).

Finally, Defendant reprises its argument raised at certification regarding the diligence exercised by each borrower in bringing their claims, contending that application of its statute of limitations defense to individual class members will be "unwieldy." ECF 94-1 at 39-40. However, this Court has already concluded at the certification stage that, given the First Mariner Class's relatively limited size and geographic scope, "it can assess, collectively, whether the available information and media reporting related to prior litigation and enforcement proceedings would have prompted a reasonable person to uncover the facts substantiating Plaintiffs' RESPA claims." ECF 47 at 11-12. *See also Dobbins v. Bank of America, N.A.*, Civil No. SAG-17-0540, 2020 WL 5095855, at *7 (D. Md. Aug. 28, 2020); *Edmondson*, 2020 WL 3128955, at *5-7. And while this Court left open the possibility that it might revisit this issue if later factual development revealed that certain class members were uniquely situated so that disparate inquiries into due diligence would be required, Defendant has pointed to no such facts that would undercut or alter this Court's prior ruling.

In sum, none of the supposedly changed circumstances identified by Defendant destroy predominance or otherwise require decertification of the First Mariner Class. Defendant's motion to decertify will therefore be denied.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Leave to File a Surreply, ECF 109, is GRANTED. Defendant's Motion for Summary Judgment and Decertification, ECF 94, is GRANTED IN PART and DENIED IN PART. Although Defendant is entitled in partial summary judgment in accordance with the analysis set forth above, the remainder of the motion (including

its request to decertify the First Mariner Class) will be denied. Plaintiffs' cross motion for partial summary judgment, ECF 97, is GRANTED IN PART on the issue of successor liability and DENIED IN PART on the issue of class membership. Finally, the parties' respective motions to seal certain exhibits which are subject to confidentiality orders issued by this Court, ECF 98, 113, will be GRANTED. A separate order follows.

Dated: January 20, 2023                              _____/s/_____
                                                     Stephanie A. Gallagher
                                                     United States District Judge